IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JEFFREY V. HOWES, *et al.*

    *Appellants*,

    v.

WELLS FARGO BANK, N.A., *et al.*,

    *Appellees*.

Civil Action No. ELH-14-2814

## MEMORANDUM OPINION

This bankruptcy appeal is rooted in the dismissal of an adversary proceeding filed in a Chapter 13 bankruptcy case.[1]

On November 15, 2012, Jeffrey Howes filed a Chapter 13 bankruptcy proceeding to prevent a foreclosure sale of his home in Fulton, Maryland. *See In re Jeffrey Howes*, Bankr. Case No. RAG-12-30614; ECF 19 at 3, 17 n.2 (Appellants' "Second Amended Brief"). Months later, on September 3, 2013, Howes and his wife, Tonya Howes, filed an adversary proceeding in the bankruptcy case, titled "Complaint to Determine Secured Status, Sanctions, and Other

---

[1] ECF 1, ECF 2, and ECF 4 contain numerous documents designated by appellants, for which ECF numbers are available. Thereafter, plaintiffs filed an Appendix, ECF 9, which contains many of the same documents. The Appendix constitutes the record on appeal, to which the parties refer in their briefs.

The Appendix exceeds 400 pages and is paginated with numbering using the prefix "Apx." However, most of the ECF page numbers of the Appendix are not legible, because they are superimposed on other text. Therefore, when citing to the Appendix, I generally refer only to the "Apx." pagination of ECF 9, found at the bottom of each page.

With respect to the parties' briefs, I cite to the ECF page numbers. The ECF page numbers do not necessarily correspond to page numbers on the submissions.

Relief."[2]  ECF 1-4.  The adversary proceeding "challenge[d] the validity and/or extent of the secured claim asserted in Amended Proof of Claim No. 4 . . . filed by Wells Fargo Bank N.A [in the bankruptcy case,] on the basis [that] Wells Fargo lacked standing to file [it], it is excessive, and subject to [other claims]."  *See Howes, et al. v. Wells Fargo Bank, N.A., et al.*, Adv. Proc. No. 13-510, ECF 1-4, ¶ 1; Apx. 23 ("Complaint").  The allegations also challenge efforts by the defendants to enforce a promissory note ("Note") executed by the Howes in November 2001, and secured by a Deed of Trust that they executed as to their home.  Apx. 22-76, Complaint. The Bankruptcy Court (Gordon, J.) dismissed the Complaint.  The Howes then noted an appeal to this Court on August 5, 2014 (ECF 38 in Adv. Proc. No. 13-510), which was docketed on September 4, 2014.  ECF 1.

## I.   Procedural Background

In the adversary proceeding, the Howes sued "Wells Fargo Bank N.A." ("Wells Fargo");[3] U.S. Bank, National Association ("US Bank");[4] Carrington Mortgage Services, LLC ("Carrington"); and Christiana Trust ("Christiana"), a Division of Wilmington Savings Fund Society, FSB ("WSFS"), as trustee for Stanwich Mortgage Loan Trust, Series 2013-2 ("Stanwich" or "Stanwich Trust");[5] and "Unknown Defendants 1 through 10."[6]  Apx 22,

---

[2] Mr. Howes is the sole debtor in the Chapter 13 case.  However, both Mr. and Ms. Howes are plaintiffs in the adversary proceeding and appellants here.

[3] Wells Fargo spells its name "Wells Fargo Bank, N.A."

[4] Throughout the record, US Bank is also referred to as U.S. Bank.

[5] The Howes refer to Christiana Trust as WSFS Bank.  As indicated, Christiana is a division of WSFS Bank. Apx. 25, Complaint ¶ 12.

[6] Plaintiffs assert that "Unknown Defendants 1 through 10" constitute "corporate entities and/or individuals that may have a legal interest in the promissory notes [sic], deed of trust, assignments or the real property which is the subject of this proceeding and/or who may be

Complaint at 1. Selene Finance, LP ("Selene"), which was not named as a defendant in the adversary proceeding, has joined the appellees' brief submitted by Christiana and Carrington (ECF 15), without objection.[7]  Numerous exhibits were appended to the suit.[8]

The Complaint contains nine counts, as follows: "Fraud Upon the Court" as to Wells Fargo and US Bank, pursuant to 11. U.S.C. § 105 and Fed. R. Bankr. P. 9011 (Count I); "Determination of Scope, Extent and Validity of Lien," as to all defendants, pursuant to 11 U.S.C. §§ 105, 506 (Count II); "Sanctions for Defective Proof of Claim," as to Wells Fargo and US Bank, pursuant to Fed. R. Bankr. P. 3001(c)(2)(D) (Count III); "Unlawful Inspection Fees" as to Wells Fargo, US Bank, and Christiana, pursuant to Md. Code (2013 Repl. Vol., 2014 Supp.), § 12-1027 of the Commercial Law Article ("C.L.") (Count IV); violations of the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 *et seq.*, as to Wells Fargo, US Bank, Christiana, and "Unknown Defendant" (Count V); violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 *et seq.*, as to Wells Fargo, US Bank, and Christiana (Count VI);

---

responsible for the acts complained of herein." Apx. 26, Complaint ¶ 13.

[7] Selene has replaced Carrington as servicer of the promissory note, on behalf of Christiana.  ECF 15 ¶ 13, Brief of Carrington and Christiana ("Christiana Brief").  Selene is represented by the same counsel who represents Carrington and Christiana.

In his opinion of November 5, 2014, Judge Gordon explained that on March 15, 2013, Wells Fargo filed an amended proof of claim in the bankruptcy case as to appellants' mortgage debt and default.  ECF 51 at 5-6, in Adv. Proc. 13-510.  Thereafter, the amended proof of claim was transferred from Wells Fargo to Carrington, then to Christiana, and finally to Christiana c/o Selene.  *Id.* at 6.

[8] The exhibits include the Affidavit of Alisha M. Allen, dated January 18, 2012; Distribution Summary for the Wells Fargo Asset Securities Corporation, Mortgage Pass-Through Certificates, Series 2003-4 ("Trust"), dated January 20, 2012; Collateral Statement for the Trust, dated January 20, 2012; undated Loan Level Data for loan 0127973402, purportedly held by the Trust; Affidavit of Shannon Menapace, dated February 17, 2012, with the Declaration of Substitution of Trustees, dated October 28, 2011; Notice of Intent to Foreclose Affidavit, dated January 12, 2012, along with a Notice of Intent to Foreclose, dated May 10, 2011.

violations of the Maryland Consumer Debt Collection Act ("MCDCA"), C.L. §§ 14-201 *et seq.*, as to Wells Fargo, US Bank, and Christiana (Count VII); violations of the Maryland Consumer Protection Act ("MCPA"), C.L. §§ 13-101 *et seq.*, as to Wells Fargo and US Bank (Count VIII); and an "Objection to Claim," pursuant to 11 U.S.C. § 502 (Count IX).

The Howes' Note, which is central to the case, was pooled at some point with several other notes in a residential mortgage-backed securitization trust. Apx 32-33, Complaint ¶¶ 42-43. Plaintiffs maintain that the trust was terminated in January 2012, and therefore any effort to collect on the Note, whether as a successor-in-interest to the trust or as an assignee of the trust, was invalid, because the trust ceased to exist. The Howes also insist that confusion as to ownership of their Note upon the trust's termination precludes any of the defendants from enforcing it. Apx. 38, Complaint ¶ 62. In addition, plaintiffs assert, *inter alia*, that Wells Fargo misrepresented itself as a creditor in a claim filed in the bankruptcy case (Apx. 39, Complaint ¶ 67), and both Wells Fargo and US Bank defrauded the Bankruptcy Court by filing a "false arrearage claim for $200,196.79," related to payments and fees due on the promissory note. Apx. 38, *id.* ¶ 66.

On October 9, 2013, Carrington and Christiana moved to dismiss the Complaint,[9] which they amended on December 18, 2013. Apx. 165-171 ("Carrington MTD"). On October 17, 2013, US Bank and Wells Fargo also moved to dismiss the Complaint. Apx. 77-126 ("Wells Fargo MTD"). The Howes opposed all motions. *See* Apx. 127-57 ("Howes Opposition to Wells Fargo MTD"); Apx. 172-81 ("Howes Opposition to Carrington MTD"). The Bankruptcy Court heard argument on the motions on January 6, 2014 (Apx. 324-51), and permitted supplemental briefing concerning the effect of the trust's termination on the enforceability of the note. Apx.

---

[9] The Appendix does not contain the initial motion to dismiss or the Howes' response.

349-50.  US Bank and Wells Fargo filed a supplemental brief on January 21, 2014 (Apx. 182-199), to which the Howes responded on February 5, 2014.  Apx. 200-06.

In an oral ruling on March 4, 2014, the Bankruptcy Court granted the motions to dismiss. Apx. 207-33; *see also* ECF 1-32.  Judge Gordon dismissed Count I (Fraud Upon the Court), with prejudice, and dismissed the remaining counts, without prejudice, and with leave to amend or to file a claim objection by May 3, 2014.  Apx. 223-230.  Plaintiffs did not amend or object by that date.  Instead, on May 5, 2014, they moved for reconsideration of the oral ruling.  Apx. 238-49. On May 12, 2014, the Bankruptcy Court entered an "Order Dismissing Complaint For Failure To State A Claim," memorializing its oral ruling ("MTD Order").  Apx. 285-87.  Plaintiffs then moved to reconsider the MTD Order.  Apx. 294-96.

After briefing on the motions to reconsider, the Bankruptcy Court heard argument on July 16, 2014 (Apx. 352), and orally denied the motions to reconsider.  Apx. 361, 367.  And, it extended until July 23, 2014, appellants' time to amend or file a claim objection.  *Id.* at 367.  On July 22, 2014, the Bankruptcy Court entered an Order embodying its oral ruling.  Apx. 297-98. Plaintiffs did not amend or object.  Instead, they noted this appeal on August 5, 2014.  *See* ECF 38 in Adv. Proc. No. 13-510; ECF 1.  Specifically, the Howes have appealed both the MTD Order of May 12, 2014 (Apx. 238-49), and the Reconsideration Order of July 22, 2014.  Apx. 297-98.

The appeal was transmitted to this Court on September 4, 2014.  ECF 1.  Plaintiffs filed their initial brief on September 29, 2014.  Two days later, on October 1, 2014, plaintiffs filed an amended brief (ECF 8), without explanation.  Then, on October 5, 2014, with leave of Court (ECF 14), plaintiffs filed the 417-page Appendix (ECF 9), which apparently included several documents not previously designated by plaintiffs.  *See* ECF 1, ECF 2, ECF 4.

Wells Fargo, US Bank, Carrington, and Christiana did not object to the submission of the Appendix.  Indeed, all parties cite to it.  Nor did they object to the inclusion of documents not previously designated in the record, or to plaintiffs' submission of the initial amended brief.

Wells Fargo and US Bank submitted their brief on October 13, 2014.  ECF 11 ("Wells Fargo Brief").  On October 16, 2014, Carrington and Christiana submitted their brief.  ECF 15 ("Christiana Brief").  As noted, Selene joined the Christiana Brief.  *Id.*  Plaintiffs submitted their reply on October 30, 2014.  ECF 18 ("Reply").  On that same date, without explanation, plaintiffs filed a "Second Amended Brief," *i.e.*, their third brief (ECF 19), without leave of court or a redlined version.

On October 31, 2014, pursuant to Fed. R. Bankr. P. 8009(a), US Bank and Wells Fargo filed a motion to strike the Second Amended Brief.  ECF 20, Motion to Strike.  Plaintiffs opposed the Motion to Strike, and it remains pending.  ECF 22 ("Opposition to Motion to Strike").  No hearing is necessary to resolve it.  *See* Local Rule 105.6.

On November 5, 2014, *i.e.*, after the appeal was filed, the Bankruptcy Court issued a "Memorandum Opinion In Support of Orders Dismissing Complaint And Denying Motions To Reconsider."  ECF 51 in Adv. Proc. No. 13-510.[10]

On December 2, 2014, plaintiffs asked the Bankruptcy Court to stay the bankruptcy proceeding.  ECF 25-2.  The Bankruptcy Court denied the request on December 9, 2014.  Bankruptcy Docket, ECF 142.  Plaintiffs then filed in this Court an "Emergency Motion to Stay Plan Confirmation Pending Appeal."  ECF 23 ¶ 6 ("Motion to Stay").  Pursuant to the Court's

---

[10] Judge Gordon relied on *In re Grand Jury Proceedings Under Seal v. United States*, 947 F.2d 1188 (4th Cir. 1991), as authority to issue a post-appeal Memorandum Opinion.  ECF 51 at 3-4 in Adv. Proc. No. 13-510.  There, the Fourth Circuit stated that a district court "had jurisdiction" to issue a "written order simply memorializ[ing] the district court's oral ruling," issued before the appeal was filed.  947 F.2d at 1190.  The Fourth Circuit observed, *id.*: "It aids the appeal by giving [the appellate court] a written order to review."

request (ECF 24), appellees responded and opposed the stay.  *See* ECF 25 (Christiana and Carrington); ECF 26 (Wells Fargo, US Bank).  In addition, the Chapter 13 Trustee filed a response in opposition.  ECF 28.  By Order dated December 16, 2014 (ECF 29), I granted the Motion to Stay (ECF 23), subject to the posting of a security bond by plaintiffs.[11]

## II.    Factual Background[12]

### A.   The Note and the Trust

On November 30, 2001, the Howes executed a "Construction Note" payable to the order of The Columbia Bank[13] (Apx. 26, Complaint ¶ 15), in the amount of $696,130.00.  Apx. 58, Note.  As security for the Note, the Howes also executed a Deed of Trust, conveying their interest in real property to the Trustee for The Columbia Bank.  Apx. 26, Complaint ¶ 15; Apx. 67, Declaration of Substitution of Trustees by Wells Fargo, N.A., dated October 28, 2011 ("Declaration of Substitution of Trustees" or "Dec. of Sub. Trustees").  The property that is the subject of the Deed of Trust is located in Howard County, Maryland and serves as the principal residence of the Howes (the "Property").  Apx. 26, Complaint ¶ 16; Apx. 58, Note.

The Note was amended by a Loan Modification Agreement dated April 16, 2003, recorded in the Land Records of Howard County.  *See* Apx. 98-105, Loan Modification Agreement.  The Loan Modification Agreement, which reflects a loan balance of $650,000.00, reduced the interest rate from a floating rate of 6% -11% to a fixed rate of 5.75%.  *Id.*  According to its terms, plaintiffs had a monthly payment of principal and interest of $3,793.22.  *Id.*  With

---

[11] On June 3, 2015, the Howes noted an appeal to this Court challenging the Bankruptcy Court's Order of March 9, 2015, concerning the security bond pending appeal. *Howes v. Wells Fargo Bank, N.A.*, No. ELH-15-617.   The appeal has not yet been fully briefed.

[12] Given the posture of the case, the facts are drawn largely from the Complaint, as well as exhibits attached to it.  Apx. 22-76.

[13] The initial lender, The Columbia Bank, is not a party to the adversary proceeding.

additional amounts escrowed for taxes and insurance, the Howes owed a total mortgage payment of about $4,500 per month.  *See* ECF 11, Wells Fargo Brief at 10 n.5.

The Note was eventually pooled with several other notes in a residential mortgage-backed securitization trust, although the precise date is not entirely clear.  The trust was titled "Wells Fargo Asset Securities Corporation, Mortgage Pass-Through Certificates, Series 2003-4" ("Trust" or "WFASC 2003-4").  Apx 32-33, Complaint ¶¶ 42-43.[14]  The Complaint does not provide a chronological trail of the assignments reflecting when or to whom The Columbia Bank sold the Note or how the Trust acquired it, although assignments were submitted to the Bankruptcy Court by Wells Fargo and US Bank.[15]

---

[14] The Maryland Court of Appeals explained in *Anderson v. Burson*, 424 Md. 232, 237, 35 A.3d 452, 455 (2011):

> Securitization starts when a mortgage originator sells a mortgage and its note to a buyer, who is typically a subsidiary of an investment bank. Christopher L. Peterson, *Foreclosure, Subprime Mortgage Lending, and the Mortgage Electronic Registration System*, 78 U. Cin. L. Rev. 1359, 1367 (2010). The investment bank bundles together the multitude of mortgages it purchased into a "special purpose vehicle,"[ ] usually in the form of a trust, and sells the income rights to other investors. *Id.* A pooling and servicing agreement establishes two entities that maintain the trust: a trustee, who manages the loan assets, and a servicer, who communicates with and collects monthly payments from the mortgagors. *Id.*

[15] The Christiana Brief sets forth the history of assignments, but without any citations to the record.  *See* ECF 15 at 4-5.  With the motion to dismiss filed by Wells Fargo and US Bank, defendants submitted as exhibits various assignments and asserted, Apx. 79 n.4, Wells Fargo MTD:

> According to the Land Records of Howard County, the Columbia Bank assigned the Deed of Trust on the Property, together with the Note and all money due thereunder ("Security Instrument") to Wells Fargo Home Mortgage, Inc. on April 16, 2003. [Liber 07153, folio 099]. On March 16, 2005, Wells Fargo Bank, N.A., successor by merger to Wells Fargo Home Mortgage, Inc., assigned the Security Instrument to First Union National Bank, as Trustee. [Liber 9083, folio 417]. Then, on July 20, 2011, Wells Fargo Bank, N.A., successor-by-merger to Wachovia Bank, N.A., formerly known as First Union Bank, as Trustee, assigned the Security Instrument to U.S. Bank National Association, as Trustee, successor

In any event, the Howes claim that, unknown to them, the Note "was removed from the Trust on January 1, 2012, and the Trust terminated and ceased to exist on January 25, 2012 . . . ." Apx. 33, Complaint ¶ 43.  This occurred before US Bank, as "'Trustee for WFASC 2003-4,'" and Wells Fargo, as "'Loan Servicer'" and agent of US Bank (Apx. 31, Complaint ¶ 36), initiated a second foreclosure case against the Howes on February 21, 2012.[16]  *Id.*; *see Dore, et al. vs. Howes, et al.* ("Second Foreclosure Case"), No. 13C12089855.  According to the Howes, upon the Trust's termination, US Bank, as trustee, and Wells Fargo, as servicer, had no right to enforce the Note.  In other words, the Howes contend that US Bank and Wells Fargo were precluded from collecting payments on the Note, assigning the Note or Mortgage, or foreclosing on the Property pursuant to the Note.  *See, e.g.*, Apx. 32, 36, 39, Complaint ¶¶ 41, 54, 55, 67.

In support of their contention that "[t]he Mortgage was removed from the Trust on January 1, 2012, and the Trust terminated and ceased to exist on January 25, 2012 . . . ." (Apx. 33, Complaint ¶ 43), the Howes rely, *inter alia*, on three documents appended to their Complaint.  The first document is a "Certificateholder Distribution Summary" for the Trust dated January 20, 2012 ("Distribution Summary"), which purportedly shows the distribution of the Trust's assets to certificateholders upon termination.  Apx. 62.  The Distribution Summary indicates that upon distribution the Trust's "Ending Certificate Balance" was zero.  *Id.*  The second document is a "Collateral Statement" for the Trust, dated January 20, 2012.  Apx. 63.  It lists the total "Beginning Loan Count" of the Trust as 127, the "Loans Paid in Full" as 127, and

---

in interest to Wachovia Bank, National Association as Trustee for Wells Fargo Asset Securities Corporation, Mortgage Pass-Through Certificates, Series 2003-4 ("Trust")  [Liber 13351, Folio 169]. . . .

[16] As discussed, *infra*, the first foreclosure case against the Howes was initiated on January 20, 2010, and was voluntarily dismissed on January 3, 2011.  Apx. 31, Complaint ¶ 36.

the "Ending Loan Count" as zero.  *Id.*   The Howes argue that this demonstrates that upon termination of the Trust, all loans were "Paid in Full" and their "Mortgage was paid off on January 1, 2012. . . ."  Apx. 33, Complaint ¶ 43; *see* Apx. 63, Collateral Statement.  The third document is an undated chart of "Loan Level Data" for a loan numbered 0127973402, held by the Trust.  Apx. 64.  The chart lists the original balance for the loan as $650,000, but denotes the current loan status as "Paid Off."[17]  *Id.*   The "PrepaymentDate [sic]" of the loan is listed as January 1, 2012.  *Id.*   According to the Complaint, the data demonstrates that "the Mortgage [at issue] was paid off on January 1, 2012 . . . ." Apx. 33, Complaint ¶ 43.

### B.  Default; First Foreclosure Case

On April 2, 2009, after experiencing "a decline in their income in 2008," the Howes defaulted on the Note.  Apx. 26, Complaint ¶ 17.  By June 2009, they were more than sixty days delinquent on payments due under the Note.  *Id.*   The Howes continued to submit partial payments through August 31, 2009, "until they discovered that they were receiving no benefit from their payments, since Wells Fargo[, as servicer of the Note,] was holding their partial payments in suspense and not applying them to their account despite aggregating more than a regular payment."  Apx. 26-27, Complaint ¶ 17.  They made no further mortgage payments until May 2013, and June 2013, both of which were returned.  Apx. 38, Complaint ¶ 59.

The Howes attempted to obtain a modification of their loan from Wells Fargo.  Apx. 27-31, Complaint ¶¶ 18-34.  The Complaint details various extensive efforts by the Howes to negotiate with Wells Fargo, in order to make their monthly payments "more affordable . . . ." Apx. 28, Complaint ¶ 23.  For instance, in July 2009 the Howes contacted Wells Fargo to

---

[17] The Complaint does not establish that the loan number of the Loan at issue is indeed 0127973402.  However, defendants do not contend that the Loan Level Data attached to the Complaint pertains to the wrong loan.

determine their eligibility "for a mortgage modification under the U.S. Treasury's Home Affordable Modification Program" ("HAMP").   Apx. 27, Complaint ¶ 18.   The Howes completed a HAMP application on August 18, 2009.   *Id.*   Despite "over 100 communications with Wells Fargo" (Apx. 27, Complaint ¶ 19), efforts to secure a modification proved fruitless. Wells Fargo rejected the Howes' HAMP application on July 19, 2010.   Apx. 27, 30, Complaint ¶¶ 20, 30.

On October 6, 2010, Wells Fargo offered plaintiffs a "Special Forbearance Agreement" that would temporarily reduce their mortgage payments and reduce their interest rate.   Apx. 27-28, Complaint ¶ 22.   The Howes timely made all three trial payments.   Apx. 28, Complaint ¶ 22. Wells Fargo then offered a "Secondary Modification Agreement," *id.*, but it required an immediate payment of $24,683.61 and a balloon payment of $58,766.56 at maturity.   *Id.*[18] Moreover, the proposed interest rate exceeded the market rate.   *Id.*   Plaintiffs rejected Wells Fargo's proposal but made a counter offer to cure their default "in exchange for a new fixed rate mortgage at the current market average rate . . . ."   Apx. 28, Complaint ¶ 23.   Wells Fargo rejected the counter offer.   *Id.*

In the meantime, on January 20, 2010, US Bank, "as principal," and Wells Fargo, as "agent" of US Bank, "caused" the first foreclosure case "to be filed  against the Howes," in the Circuit Court for Howard County, captioned *Dore, et al. v. Howes, et al.*, Case No. 13C10080927 ("First Foreclosure Case").   Apx. 31, Complaint ¶ 36.   Wells Fargo and US Bank

---

[18] In their brief, Wells Fargo and US Bank state, ECF 11 at 10 n.5:

> Accordingly, having made no mortgage payments since August 31, 2009, Appellants were more than 11 months in arrears, or approximately $50,000.00 delinquent. The upfront cash payment [of $24,683.61] that Wells Fargo proposed was less than half the amount then due.

were represented by Covahey, Boozer, Devan & Dore, P.A ("CBD&D").  Apx. 31, Complaint ¶ 37.

The Howes complain that, with respect to the First Foreclosure Case, US Bank "caused" several "false affidavits" to be filed.  Apx. 50, Complaint ¶ 130.  In particular, the Howes call into question several affidavits dated December 31, 2009, which were allegedly "signed by notorious robo signer Herman John Kennerty . . . ."  Apx. 32, Complaint ¶ 39 (collectively, the "Kennerty Affidavits").  They include the following affidavits, *id.*:

> (a) Affidavit Pursuant to [Md. Code (2003 Repl. Vol.[19]), §] 7-105.1(d) [of the Real Property Article ("R.P.")][20] and [Maryland Rule] 14-207(b)(3),[21] regarding ownership of the debt instrument, (b) Non-Military Service Affidavit, allegedly notarized, and (c) Affidavit Pursuant to [R.P. §] 7-

---

[19] Generally, I cite to the current version of the Maryland Code.  But, on occasion, I cite to the version in effect during the Howes' foreclosure cases.  Unless otherwise indicated, the version of the Maryland Code in effect during the Howes' foreclosure cases does not differ in any material way from the current version of the Maryland Code.

[20] In Maryland, "[a] foreclosure plaintiff commences an action to foreclose a deed of trust, which contains a power of sale provision, by filing an order to docket."  *Anderson, supra,* 424 Md. at 236 n.6, 35 A.3d at 455; *see* Md. Code (2003 Repl. Vol.), R.P. § 7-105.1(d).  In particular, Md. Code (2003 Repl. Vol.), R.P. § 7-105.1(d)(1), referenced by several of the Kennerty Affidavits and titled "*Order to docket or complaint to foreclose,*" set forth what the order to docket initiating a foreclosure action had to include.  The Real Property Article has since been revised.  In Md. Code (2010 Repl. Vol., 2014 Supp.), the "*Order to docket or complaint to foreclose*" provision is now found at R.P. §7-105.1(e).

[21] Title 14 of the Maryland Rules refers to "Sales of Property."  Chapter 200 of Title 14 is called "Foreclosure of Lien Instruments."  Rule 14-207(b) sets forth the exhibits that must be submitted with an order to docket, including, among other things "(1) a copy of the lien instrument supported by an affidavit that it is a true and accurate copy, or, in an action to foreclose a statutory lien, a copy of a notice of the existence of the lien supported by an affidavit that it is a true and accurate copy; ( 2) an affidavit by the secured party, the plaintiff, or the agent or attorney of either that the plaintiff has the right to foreclose and a statement of the debt remaining due and payable[.]"

105.1(c),[22] regarding a [Notice of Intent to Foreclose], default, and right to foreclose . . . .

The Howes allege: "None of the Kennerty Affidavits are based on any investigation by Mr. Kennerty, other than to ensure they were properly dated, and they are therefore devoid of his personal knowledge of the other facts stated therein." Apx. 32, Complaint ¶ 39. According to plaintiffs, Kennerty testified under oath on May 20, 2010, that he signs "'50 to 150 documents per day . . . .'" *Id.* Kennerty also testified that he "'simply sign[ed] the document that's presented'" to him and "'just [made] sure that the date is correct.'" *Id.*

The Howes also challenge a second set of documents submitted in the First Foreclosure Case. These are a series of affidavits purportedly signed by Thomas P. Dore, Esq. of CBD&D, dated January 19, 2010 (collectively, the "Dore Affidavits"). Apx. 32, Complaint ¶ 38. The Dore affidavits are described in the Complaint as follows: "(a) Affidavit Pursuant to 7-105.1(d) and 14-207(b)(1) regarding the lien instrument, (b) Affidavit Pursuant to 14-207(b)(4) regarding the Declaration of Substitution of Trustees, (c) Affidavit Pursuant to 7-105.9(B)(1) regarding notice to all occupants, and (d) a Statement of Debt allegedly notarized by Alysha Currie . . . ." *Id.* In particular, plaintiffs assert: "Upon information and belief, Mr. Dore did not sign the Dore Affidavits, nor was the Statement of Debt signed by him in the presence of Alysha Currie." *Id.*

According to the Howes, the First Foreclosure Case was "voluntarily dismissed" by the

---

[22] Md. Code (2003 Repl. Vol.), R.P. § 7-105.1(c)(1), referenced in one of the Kennerty Affidavits, provided:

> Except as provided in subsection (b)(2)(iii) of this section, at least 45 days before the filing of an action to foreclose a mortgage or deed of trust on residential property, the secured party shall send a written notice of intent to foreclose to the mortgagor or grantor and the record owner.

foreclosure plaintiffs on January 3, 2011 (Apx. 31, Complaint ¶ 36), "due to the defective Dore and Kennerty Affidavits."  Apx. 32, Complaint ¶ 40.

### C.  Second Foreclosure Case

On February 21, 2012 (Apx. 29, Complaint ¶ 26),  US Bank, as "principal," and Wells Fargo, as its "agent . . . caused" the filing of the Second Foreclosure Case against the Howes, also in the Circuit Court for Howard County.   Apx. 31, Complaint ¶ 36.   According to the Howes, when the Second Foreclosure Case was filed, neither US Bank nor Wells Fargo had the right to enforce the Note on behalf of the Trust, because the Trust had been terminated.  *See*, *e.g.*, Apx. 32, Complaint ¶ 41.   Given that the Trust "ceased to exist[ ]," plaintiffs maintain that the Second Foreclosure Case constituted "a fraud on the Howes and on the Circuit Court for Howard County," because US Bank and Wells Fargo falsely represented that they had "standing" (Apx. 32, Complaint ¶ 41) to enforce the Note on behalf of the Trust.  Apx. 29, Complaint ¶ 26; *see also* Apx 38, Complaint ¶ 67.   Moreover, because the Trust had already been terminated, the Howes claim that all documents filed in the case constituted misrepresentations.

In particular, the Howes allege:  "US Bank caused at least four false affidavits to be filed in the Second Foreclosure Case . . . ."  Apx. 51, Complaint ¶ 132.   According to the Howes, in these documents US Bank "falsely claim to be the owner of the Note" and also "sought to hide the Trust termination from the Howes . . . ."  Apx. 51, Complaint ¶ 131.   In their Complaint, the Howes described the four documents, as follows.

The first document (Doc. No. 5 in the Second Foreclosure Case) is an "Affidavit Certifying Ownership of Debt Instrument and Accuracy of Note Submitted Herewith," dated January 18, 2012, which was "allegedly" signed by Alisha M. Allen, Vice President of Loan Documentation for Wells Fargo Home Mortgage, Inc., as servicer for the subject mortgage

("Allen Affidavit").   Apx. 33, Complaint ¶ 42.   The Allen Affidavit identified "'US Bank National Association, as Trustee, successor in interest to Wachovia Bank, National Association, as Trustee for [the Trust], Series 2003-4.'"   *Id.*   And, the Allen Affidavit also identified the Trust as the "'owner and holder of the loan evidenced by the Note,'" *id.*, although the Trust no longer existed.

A purported copy of the Note is attached to the Allen Affidavit.   Apx. 33, Complaint ¶ 44.   According to the Complaint, the Note contains the following "endorsements": "(A) Pay to the order of Wells Fargo Home Mortgage, Inc., by Michael Torcisi, Vice President, The Columbia Bank, and (B) pay to the order of Wachovia Bank, National Association, as Trustee under the pooling and servicing agreement dated May 29, 2003, by Beverly Cro[ckett], Assistant Secretary of Wells Fargo Home Mortgage, Inc."[23]   Apx. 33, Complaint ¶ 44 (alteration in the Complaint).

An allonge dated November 21, 2009, is also attached to the Allen Affidavit ("Allonge").[24]   Apx. 33, Complaint ¶ 45.   The Allonge identified "'Wachovia Bank, National Association ["Wachovia"], as Trustee under a pooling and servicing agreement dated as of May 29, 2003 . . . .'" *Id.*[25]   Pursuant to the Allonge, Wachovia, as the "present holder" of the Note, "'hereby assigns all of [Wachovia's] rights, title and interest in said Note to US Bank National

---

[23] Throughout the record, the last name is spelled "Cro[ckett]," with the brackets included.

[24] An allonge is a "slip of paper sometimes attached to a negotiable instrument for the purpose of receiving further indorsements when the original paper is filled with indorsements." *Anderson*, 424 Md. at 240 n.10, 35 A.3d at 457 n.10 (quoting BLACK'S LAW DICTIONARY 88 (9th ed. 2004)). Pursuant to Md. Code (2013 Repl. Vol., 2014 Supp.), C.L. § 3-204(a), any document "affixed" to a note, such as an allonge, is considered part of the note.

[25] The pooling and service agreement is not part of the Appendix.

Association, as Trustee for WFASC 2003-4[.]'"  Apx. 34, Complaint ¶ 45.  The Allonge further provided: "'Pay to the Order of US Bank National Association, as Trustee for WFASC 2003-4 (Without recourse, representation, or warranty express or implied)' and is allegedly signed by Karan Abernethy as Vice President of Wachovia."  Apx. 33-34, Complaint ¶ 45.  In a nutshell, the Allonge purported to show a transfer of the Note from Wachovia, as present holder, to US Bank, as Trustee for the Trust.  Again, in plaintiffs' view, the Allen Affidavit and the Allonge are fraudulent because they omitted any indication that the Trust had been terminated.

The second document (Doc. No. 7 in the Second Foreclosure Case) is the "Affidavit Pursuant to [Maryland Rule] 14-207(b)(4)," dated February 17, 2012, signed by Shannon Menapace[26] as a "SUBSTITUTED TRUSTEE in the subject case" ("Menapace Affidavit").  Apx. 66.  Ms. Menapace certified that a "true and accurate" copy of the Declaration of Substitution of Trustees is attached to the Menapace Affidavit.  *Id.*

The Declaration of Substitution of Trustees dated October 28, 2011, was allegedly executed by Wells Fargo as "Attorney-in-fact for US Bank National Association, as Trustee, successor in interest to Wachovia Bank, National Association as Trustee for [the Trust] . . . ."  Apx. 67, Dec. of Sub. Trustees.  The Declaration purported to substitute "Thomas P. Dore, Mark S. Devan, Gerard F. Miles, Jr., Shannon Menapace, and Erin Gloth, as Substituted Trustees [for the Trust,] in the place and stead of Michael T. Galeone and Matthew T. Becker . . . ."  *Id.*; *see also* Apx. 34, Complaint ¶ 46.[27]  Again, in plaintiffs' view, the submission was misleading

---

[26] In the Complaint, appellants spell the affiant's name as "Mennapace."  I have used the spelling as it appears in the Affidavit.  Apx. 66.

[27] The appointment or replacement of a substitute trustee does not convey an interest in the subject property.  The Maryland Court of Special Appeals explained in *Svrcek v. Rosenberg*, 203 Md. App. 705, 729, 40 A.3d 494, 509 (2012) (internal quotations omitted) (emphasis in *Svrcek*):

because the Trust no longer existed.

Plaintiffs also challenge as fraudulent in the Second Foreclosure Case the "Affidavit of Date and Nature of Default and Mailing of Notice of Intent to Foreclose" ("NIF Affidavit," Doc. No. 11 in the Second Foreclosure Case).  Apx. 69-76; *see also* Apx. 34, Complaint ¶ 47.  It was purportedly executed on January 12, 2012, by Erinn T. Rochelle as Vice President of Loan Documentation for Wells Fargo. Apx. 69.  The NIF Affidavit identified Wells Fargo as servicer for the Trust, but omitted that the Trust had been terminated.  *Id.*  Attached to the NIF Affidavit is a Notice of Intent to Foreclose on the Property, dated May 10, 2011.  Apx. 34, Complaint ¶ 47; Apx. 69, NIF Affidavit; Apx. 75, Notice of Intent to Foreclose.

In addition, the Howes challenge Document No. 15 in the Second Foreclosure Case, titled "Final Loss Mitigation Affidavit," dated February 15, 2012, and purportedly executed by Daryl J. Rollins, Vice President of Loan Documentation.  Apx. 34, Complaint ¶ 48.[28]  Rollins averred that he was "'authorized to act on behalf of the secured party who is the holder of the beneficial interest in the mortgage or deed of trust.'"  *Id.* (quoting the Final Loss Mitigation Affidavit).

According to the Complaint, on April 30, 2012, an Order was entered in the Second Foreclosure Case (Doc. No. 21) stating: "'It is determined that the service of the Order to

---

[An a]ppointment of substitute trustees . . . merely serves to appoint new trustees to exercise the lender's power under the deed of trust to foreclose the right of redemption, subject to the mortgagor's equitable right to redeem the property prior to the sale . . . . *Without conveyance of the Property,* the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by applicable law. . . . The substitution of trustees merely designated new individuals as having the right to enforce the deed of trust . . . . [T]he deed of appointment of substitute trustees merely authorized the trustees to foreclose the right of redemption and exercise the power of sale . . . .

[28] The Complaint fails to specify Rollins' employer.

Docket[29] and related documents was deficient. If plaintiff does not demonstrate to the Court within 30 days of entry of this Order . . . that the deficiency has been cured . . . then the Court will dismiss the action without prejudice[.]'" Apx. 35, Complaint ¶ 49 (quoting Order) (alteration in Complaint).  The Howes allege that the foreclosure plaintiffs did not file a response within the time allowed, and the case was stayed as a result of the underlying bankruptcy case. *Id*.  To my knowledge, the Second Foreclosure Case is pending.  Apx. 31, Complaint ¶ 36.

## D. Bankruptcy

In June 2012, the Howes attempted to secure "an equitable, long-term modification" of their mortgage from Wells Fargo. Apx. 29-30, Complaint ¶ 28.   Their efforts were unsuccessful. In August 2012, Wells Fargo rejected the Howes' second HAMP application.   Apx. 30, Complaint ¶ 30.

On November 15, 2012, Mr. Howes filed a voluntary petition for bankruptcy under Chapter 13 of the United States Bankruptcy Code (Apx. 35, Complaint ¶ 50), in order to prevent the foreclosure sale of the Howes' residence, scheduled for November 16, 2012.  ECF 19 at 3, 17 n.2, Second Amended Brief.[30]  On December 13, 2012, Mr. Howes, as Debtor, filed his "Chapter 13 Plan" ("Plan") to pay $35,662.00 in pre-petition mortgage arrears, while making post-petition payments directly to Wells Fargo.  *Id*.  According to the Complaint, in the Plan and in Schedule D of the bankruptcy petition, Debtor indicated that "[t]he amount owed, the ownership of the Note, and the secured status of the alleged owner and holder of the Note" were "'disputed.'"  *Id*.

---

[29] *See* note 20, *supra*, for an explanation of an "order to docket."

[30] The Complaint itself does not state that the Howes filed for bankruptcy to prevent the foreclosure sale, nor does it indicate that the foreclosure sale was scheduled for November 16, 2012.  *See* ECF 19 at 3, 17 n.2.  In the Second Amended Brief, the Howes indicate that "they will seek leave to supplement the record by adding" a statement of financial affairs that specifies the date of the foreclosure sale.  *Id*.

Wells Fargo filed an "Objection to Confirmation of Plan" ("Plan Objection") in the bankruptcy case on January 9, 2013.  There, Wells Fargo identified itself as "'Servicer for US Bank National Association, as Trustee, successor in interest to Wachovia Bank, National Association as Trustee for Wells Fargo Asset Securities Corporation, Mortgage Pass-Through Certificates, Series 2003-4.'" Apx. 35-36, Complaint ¶ 52 (quoting Plan Objection).

On March 8, 2013, US Bank filed a claim in the bankruptcy case designated as "Claim No. 4" ("Claim"), in the amount of $740,334.24, of which $200,196.79 was claimed as pre-petition arrearages.  Apx. 36, Complaint ¶ 53.  US Bank was listed on the Claim as the "creditor," with notices regarding the Claim to be sent to Wells Fargo.  *Id.*  The Claim was signed by Brian McNair, Esquire on January 2, 2013; he is listed as an attorney with the law firm of CBD&D.  *Id.*  But, no supporting documentation was attached to the Claim.  *Id.*  According to the Howes, the lack of such documentation demonstrated that there was "no evidence of perfection" and no "breakdown of the claimed arrearage."  *Id.*

Wells Fargo filed an amended claim on March 15, 2013, designated "Claim 4-2" ("Amended Claim"), which identified Wells Fargo as the creditor, instead of US Bank.  Apx. 36, Complaint ¶ 54.  Pursuant to Fed. R. Bankr. P. 3001(c)(2),[31] Wells Fargo submitted with the Amended Claim an undated form "Mortgage Proof of Claim Attachment"; an "Escrow and Account Disclosure Statement" dated November 21, 2012; the Deed of Trust, and purportedly indorsed copies of the Note and Allonge.  *Id.*  Plaintiffs allege:  "No evidence of Wells Fargo's standing to file the Amended Claim was attached."  *Id.*

---

[31] Fed. R. Bankr. P. 3001 is entitled "Proof of Claim."  Of relevance here, Rule 3001(c)(2)(A) provides:  "If, in addition to its principal amount, a claim includes interest, fees, expenses, or other charges incurred before the petition was filed, an itemized statement of the interest, fees, expenses, or charges shall be filed with the proof of claim."

On April 2, 2013, in the bankruptcy case, Mr. Howes, as Debtor, filed an objection to Wells Fargo's Amended Claim ("Claim Objection"), challenging Wells Fargo's "standing" to file the claim.   Apx. 36, Complaint ¶ 55.   Debtor also argued that the claim amount was excessive because not all mortgage payments made by the Howes were adequately credited.   *Id.* In addition, Debtor contended that the "inspection fees [in the Amended Claim] disguised as broker's price opinion fees" were "unlawful."   *Id.*

In the meantime, the Amended Claim was transferred to Christiana.   Apx. 37, Complaint ¶ 56.   As previously indicated, Christiana is a division of WSFS, trustee for Stanwich Trust. Apx. 25, Complaint ¶ 12.   At the time of the transfer, Carrington was designated as servicer of the Note on behalf of Christiana.   Apx. 25, Complaint ¶ 11.

On May 29, 2013, Michael T. Cantrell, as agent for Carrington, filed in the bankruptcy case a notice of "*Transfer of Claim Other Than for Security* of the Amended Claim" ("Transfer Notice").   Apx. 37, Complaint ¶ 56 (italics in Complaint).   There, Wells Fargo was listed as transferor, and Carrington was mistakenly listed as transferee of the Amended Claim.   *Id.*   As indicated, Carrington was not the owner of the Note; it was purportedly the servicer.   Apx. 25, Complaint ¶ 12. Plaintiffs also challenge the Transfer Notice as defective because Carrington "failed to attach the required proof of transfer."   Apx. 37, Complaint ¶ 56.

Mr. Cantrell, as agent for Christiana, attempted to correct the error on June 11, 2013, by filing an "*Amended Notice of Transfer of Claim Other Than for Security* of the Amended Claim" ("Amended Transfer Notice").   Apx. 37, Complaint ¶ 57 (italics in Complaint).   The Amended Transfer Notice listed Christiana as the transferee, instead of Carrington.   *Id.*   According to the Complaint, Christiana "failed to attach the required proof of transfer."   *Id.*

In the Complaint, the Howes contend that they "received no notice of transfer of their

Note or the right to service their Mortgage from Wells Fargo." Apx. 38, Complaint ¶ 60. Further, they alleged that they "received no communication from Defendants [Carrington] or [Christiana] regarding their interest in the Howes' Mortgage other than the notices filed in the Bankruptcy Case."[32] Apx. 38, Complaint ¶ 61.

In the meantime, "[o]n or about May 2, 2013, and June 13, 2013, Defendant Wells Fargo rejected and returned Debtor's post-petition mortgage payments in the amount of $4,835.64 each."[33] Apx. 38, Complaint ¶ 59.

On June 17, 2013, the Bankruptcy Court held a hearing on the Claim Objection. Apx. 37, Complaint ¶ 55. Debtor was present, but no adversary defendants appeared. *Id.* ¶ 58. According to the Complaint, the Bankruptcy Court denied the relief requested in the Claim Objection because the claim transferees had not been served. Apx. 36-37, Complaint ¶ 58. Therefore, the Bankruptcy Court "instructed Debtor to serve the Amended Claim transferees either by supplemental service, amended objection, or, in view of all the transfers, by initiating an adversary proceeding incorporating the claim objection to determine the party entitled to enforce the Note." *Id.*

### E.  Adversary Proceeding

On September 3, 2013, the Howes initiated the adversary proceeding. In their 34-page Complaint, they challenged defendants' right to enforce the Note. Several of their contentions have already been recounted. The Howes asserted, *inter alia*, that they "do not know the identity

---

[32] As noted, Selene has since replaced Carrington as servicer of the Note, on behalf of Christiana. ECF 15 ¶ 13, Christiana Brief.

[33] According to Wells Fargo and US Bank, the payments were returned because the Howes had sought Chapter 13 relief. Apx. 79, Wells Fargo MTD ¶ 3 n.3.

of the rightful owner of the Note." Apx. 38, Complaint ¶ 62.[34]  They also alleged that none of the

defendants "are in possession of the Note."  *Id.* ¶ 63.  And, they asserted, Apx. 39, Complaint ¶

67:

> Wells Fargo filed its Amended Claim as creditor with the intent to defraud
> this Court, the Debtor, and the estate created by the Bankruptcy Case, by hiding
> the fact that the Trust terminated back in January 2012 and therefore it was not
> entitled to collect the Second Foreclosure Fees. Wells Fargo sought to hide Trust
> termination by not attaching to the Amended Claim evidence of Trust
> termination . . . . Wells Fargo failed to disclose Trust termination in the Amended
> Claim to conceal the fact that the Second Foreclosure Case was wrongfully filed,
> contained numerous false and fraudulent affidavits regarding standing to
> foreclose . . . and the fact that the Trust lacked standing to file the Claim.

On January 6, 2014, the Bankruptcy Court held a hearing on the defendants' motions to

dismiss.  The following colloquy ensued between Judge Gordon and counsel for the Howes,

Apx. 342-45:

| | |
|---|---|
| THE COURT: | Why don't you tell me what the fraud is [as to Count I]? |
| MR. HAEGER: | The main fraud is trying to hide the fact that there was no standing to file the foreclosure case. |
| THE COURT: | How did your clients rely on that?  And have they been damaged by it? |
| MR. HAEGER: | Well the fraud is alleged in connection with fraud on the Court. |
| THE COURT: | No, you say on the debtors, that is what your complaint says.  You say well it all goes back to when they told us we were going to work out a settlement with you and then they said we couldn't work out a settlement with you . . . . |
| MR. HAEGER: | Well, that is separate – that is correct.  That is separate – |
| THE COURT: | . . . . So, what is the fraud? |
| MR. HAEGER: | So, I would say that there are two areas.  The first area and |

---

[34] The adversary defendants agree that Christiana is the secured creditor of the Note.
ECF 15 at 6, Christiana Brief ¶ 13; ECF 11 at 7 n.1, Wells Fargo Brief.

the most important area is the fraud on the Court by not disclosing the fact that there was no standing to file that second foreclosure case.

THE COURT:            Because the trust terminated?

MR. HAEGER:           That is correct, Your Honor.

THE COURT:            So, what happened to the mortgage or the note after the trust terminated?

MR. HAEGER:           The Plaintiffs would love to know.

THE COURT:            That is not an answer.  As a lawyer, what happened to it?

MR. HAEGER:           Well, as a lawyer –

THE COURT:            What would be the law in that circumstance?

MR. HAEGER:           As I set forth in my response the loan was transferred out of the trust before the trust terminated.

***

THE COURT:            So, you are saying that they are trying to -- Wells Fargo intentionally misrepresented their status because the trust was terminated?

MR. HAEGER:           That is right.

THE COURT:            And what were they gaining from that, [c]overing up the $2,000 in foreclosure fees?

MR. HAEGER:           I have seen people do strange things.  And –

THE COURT:            No, you are the Plaintiff.  What were they gaining from that?  Why did they conduct – why did they commit the fraud, per your allegation?

MR. HAEGER:           The main motivation would be to preserve the foreclosure, the fact that they filed the foreclosure case that it was a rightful foreclosure when it wasn't, and to preserve the fees they sought to collect as a result of that.  You look at their behavior and you scratch your head.  What is going on here.  Why are they doing what they are doing?

> THE COURT:         That doesn't make it fraud.  Fraud is serious.  Fraud
>                    allegations [are] serious business.

At the conclusion of the hearing, Judge Gordon indicated that he wanted to "take a close look at the legal authorities" involved in this case.   Apx. 347.  He also permitted the parties to submit supplemental briefing on the significance of the Trust's termination.  Apx. 349-50.[35]

The Bankruptcy Court reconvened for a second hearing in the adversary proceeding on March 4, 2014.  At that hearing, Judge Gordon granted the motions to dismiss.  He explained, Apx. 213-14:

> I will note here that while the Debtor alleges that the particular securitization trust complained of was terminated, and that is basically the operative fact that forms

---

[35] On January 27, 2014, Judge Gordon held a hearing in the Bankruptcy case on other matters.  In his Memorandum Opinion of November 5, 2014, Judge Gordon noted that, at that hearing, Mr. Howes admitted that he was in default on the Note and that he had not paid the mortgage for many years.  See ECF 51 at 23 in Adv. Proc. No. 13-510.  The hearing transcript is filed in the bankruptcy case at ECF 130, Bankr. Case No. 12-30614.  This Court may take judicial notice of the court transcript. *See Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015) (internal quotations omitted).

Of particular relevance, Mr. Howes testified as follows, ECF 51 at 22-23 in Adv. Proc. No. 13-510, Memorandum Opinion of November 5, 2014 (quoting hearing transcript):

> THE COURT: … In other words, you're not claiming that you don't owe the money, right? Or are you?

> THE WITNESS: No, I am not claiming that I do not owe my mortgage, Your Honor.

> *  *  *

> THE COURT: So you don't believe that any of the defendants that you're (sic) sued should receive payments for the mortgage?

> THE WITNESS: That is correct, Your Honor.

> THE COURT: But you believe you do owe money to someone.

> THE WITNESS: That is correct, Your Honor.

the basis of much of what is alleged in the complaint after that allegation in terms of wrongdoing by the Defendants, the reason the trust seems to have "terminated" is because all of the loans, including this one, were paid in full. I mean, that is what the complaint says.

But we know that that is not true by the Debtor's own admission. So fundamentally the complaint takes us into an unreal world, one where the Debtor has to know and realize that the operative fact that he relied upon to suggest that his mortgage is now floating in space without ownership, or at least that he "doesn't know who the owner is," is false in the operative fact. I mean, the payment in full is what it takes to terminate the trust, or at least one thing, the one cited reason in the complaint. And that didn't happen here . . . .

The Bankruptcy Court added, Apx. 224-25:

The filing of an incorrect claim is not actionable unless there is a knowing and fraudulent filing.  The Debtor's assertion simple [sic] assumes without explanation that the proof of claim, proofs of claim, were filed to claim fees to which the Defendants were not entitled because the trust terminated.  But there is no explanation as to why trust termination would cut off the right to enforce the note.  And that is the crucial problem with the complaint.

***

What it comes down to is the allegation that this mortgage became a part of the securitization package, and that's not fair.  And therefore, I, the Debtor, have been injured.  That doesn't state a claim for relief and certainly doesn't state a claim for relief for fraud.  Therefore, count one will be dismissed with prejudice.

The Bankruptcy Court determined that, under the circumstances of this case, "termination of the trust doesn't matter.  The Debtor/Creditor relationship is unchanged. . . ."  Apx. 215.

Judge Gordon observed:  "The Debtor's default does not turn the lenders into villains."  Apx. 217-18.  In his view, the termination of the Trust did not relieve the Howes of their obligations under the Note and Deed of Trust.  Apx. 214-15, 223.  Judge Gordon also regarded the fraud claim as defective because no cognizable injury resulted from the alleged failure to disclose that the Trust had been terminated.  Apx. 223.  He dismissed, with prejudice, the claim for Fraud Upon the Court (Count I).  Apx. 225.

With respect to Count II, the Howes sought a "Determination of Scope, Extent and

Validity of Lien." Apx. 41, Complaint at 20. At the hearing on March 4, 2014, the Bankruptcy

Court acknowledged the Note's complex transfer history and various blunders committed by

those seeking to enforce the Note, which justified the Howes' request for clarification as to

which party is the present holder of the Note. It placed the burden on the noteholder to present

information establishing its entitlement to enforce the Note. Apx. 226. The Bankruptcy Court

explained, *id.* (emphasis added):

> This is my ruling as to count two. There is confusion here created by the
> securitization process that has been exacerbated by bumbling. *Therefore, the*
> *present holder of the note will provide a detailed affidavit, under penalty of*
> *perjury, within 30 days of today confirming who owns and has a right to enforce*
> *the loan documents.* All relevant transactional documents will be identified and
> provided to the Debtor, if the Debtor requests them. In other words, we don't
> want this to turn into harassment. But under the circumstances, the Debtor
> probably does *have a right to at least know with certainty the basis for the present*
> *noteholder's claim to ownership to the note*, because of the sloppiness that has
> gone on historically in this case.

At the hearing on March 4, 2014, the Bankruptcy Court dismissed the remaining counts

of the Complaint, without prejudice, and with leave to amend or to file a claim objection by May

3, 2014. Apx. 230. The Bankruptcy Court also directed the noteholder defendant to "provide a

detailed affidavit, under penalty of perjury, within 30 days . . . confirming who owns and has a

right to enforce the loan documents." Apx. 226.

On April 3, 2014, Carrington submitted an Affidavit Certifying Ownership Of Debt

Instrument," signed by Elizabeth A. Ostermann, Vice President of Default and Attorney in Fact

for Carrington, dated March 31, 2014 ("Ostermann Affidavit"). Apx. 236. Carrington is listed

as the loan servicer for Christiana, trustee for the Stanwich Trust. *Id.* The Ostermann Affidavit

purported to "[c]onfirm[ ] that Christiana Trust, a Division of Wilmington Savings Fund Society,

FSB, as trustee for Stanwich Mortgage Loan Trust, Series 2013-2 is the Owner of the Loan."

Apx. 237 (underlining in original). Carrington also submitted a "Line" to the Bankruptcy Court

indicating: "A true and accurate copy of the documents listed in the Affidavit will be sent directly to counsel for the debtor . . . ." Apx. 234.  The documents listed included the Note, Deed of Trust, a lost note affidavit, and five assignments of the Note.  Apx. 237 ("Christiana Ownership Materials").[36]

The Bankruptcy Court memorialized its oral ruling of March 4, 2014 in a written order, entered on May 12, 2014, *i.e.* the MTD Order,. Apx. 285-87.  In particular, the MTD Order provided for the following: (a) dismissal of Count I of the Complaint, with prejudice, for failure to state a claim; (b) dismissal of the remaining counts as to all defendants, without prejudice; (c) Carrington and Christiana were directed to submit an affidavit explaining their claim of ownership to the subject Note and mortgage; and (d) the Howes were directed to file an objection to the Amended Claim and/or an amended complaint by May 3, 2014, "or the Complaint shall be dismissed with prejudice."  Apx. 286-287.

The Howes filed two motions to reconsider.  The first motion was in response to the Bankruptcy Court's oral ruling issued on March 4, 2014.  Apx. 238-49.  The Howes filed a second motion to reconsider in response to the MTD Order of May 12, 2015.  Apx. 294-96.

On July 16, 2014, the Bankruptcy Court heard oral argument on both motions to reconsider.  Apx. 351.  Judge Gordon acknowledged that, in his oral ruling on the motions to dismiss, he may have "over-focused" on the matter of Trust termination.  Apx. 361.  But, he noted that, whether or not the Trust was terminated, he was correct that the Complaint failed to state a claim for fraud, given the lack of "required specificity."  *Id.*  He reviewed the elements of a fraud claim (Apx. 361-62), and pointed to "sloppiness" in the proof of claim (Apx. 362), but said, Apx. 363: "If I were to find fraud every time a proof of claim was mistakenly filed, then it

---

[36] The Appendix does not include copies of the documents purportedly sent to counsel for Debtor to establish the basis for Christiana's interest in the Note.

would be a never ending process."  In his view, termination of the Trust did not "wipe out the obligations of the Plaintiffs."  *Id.*  He added, *id.*:  "And it doesn't give the Plaintiffs a cause of action for fraud."  In addition, Judge Gordon found no allegations of a cognizable injury as a result of the purported misrepresentations.  Apx. 363-67.  Therefore, he orally denied the motions for reconsideration (Apx. 361-67) and allowed seven days for plaintiffs to amend the remaining claims or to file an objection to claim.  Apx. 367.

The oral ruling was reduced to a written order, *i.e.*, the Reconsideration Order, entered on July 22, 2014.  Apx. 297-98.  The Reconsideration Order stated:  "Because Count I of the Complaint fails to state a cognizable, good faith claim for fraud, the Order will not be reconsidered." Apx. 298.  The Bankruptcy Court added:  "[T]o the extent the [plaintiffs] may have legitimate claims that (a) one or more of the present defendant/claimants are not entitled to enforce the underlying loan documents or (b) the amount of debt asserted in [the Amended] Proof of Claim [ ] is incorrect, then those assertions must be raised through either an objection to claim or amended complaint."  Apx. 298.  Judge Gordon also granted plaintiffs until July 23, 2014, to file an amended complaint or objection to Amended Proof of Claim.  *Id.*  Instead, the Howes noted an appeal to this Court.  *See* ECF 38 in Adv. Proc. No. 13-510; ECF 1.

On November 5, 2014, after the appeal was filed, the Bankruptcy Court issued a "Memorandum Opinion In Support Of Orders Dismissing Complaint And Denying Motions to Reconsider," in order to "aid the decisional process on appeal . . . ." ECF 51 in Adv. Proc. No. 13-510.[37]  In its Memorandum Opinion, the Bankruptcy Court said, in part, *id.* at 17-18:

> Plaintiffs do not dispute that Wells Fargo had the right and power to
> enforce the Note and Mortgage for the many years they were in default and living

---

[37] As indicated in note 10, *supra*, Judge Gordon relied on *In re Grand Jury Proceedings Under Seal v. United States*, 947 F.2d 1188 (4th Cir. 1991), to establish a basis for entering his Memorandum Opinion after the appeal had been noted.  ECF 51 at 3-4 in Adv. Proc. No. 13-510.

in the Residence for free and then during the period when they attempted to negotiate a HAMP modification.  But per the Plaintiffs' theory, the termination of the Securitized Trust brought about a fundamental sea change that permanently altered the landscape. . . .  As "theories of the case" go, this is mind-bendingly obtuse.  Perhaps purposefully so.  Nevertheless, as a blueprint for a fraud claim it amounts to patent nonsense.

Judge Gordon continued, *id.* at 18-19 (emphasis in Memorandum Opinion):

At the core of the dismissal with prejudice of Count I is the Complaint's irremediable failure to explain with precision beyond rhetoric and hyperbole why Wells Fargo's holding itself out as a creditor by filing proofs of claim amounts to fraud.

Wells Fargo's actions could only possibly be wrongful if it knew or should have known that it had no right to file the proofs of claim, *because some other, identifiable true holder of the Note and DOT was entitled to do so*, yet filed the claims anyway in contravention of that holder's rights.[1]  However, during argument Mr. Haeger could not (or would not) articulate what happened to the Note and DOT when the Securitized Trust terminated:  did they revert to the original owner, were they magically transferred to some other entity or did they simply disappear into nothingness?  This point is crucial because without a precise allegation as to the ultimate disposition of the Note and DOT that plausibly establishes that Wells Fargo knew or should have known that it had no enforcement rights – that its attempted collection and enforcement of the indebtedness was at odds with the rights of the true holder – the allegation of wrongful conduct by Wells Fargo is mere fanciful malarkey.

Further, Judge Gordon said:  "The remaining counts of the Complaint also had to be cleansed of the detritus of the bogus fraud allegations.  Those allegations run like toxins" through Counts III, V, VI, VIII, and IX, "where every allegation of the Complaint is incorporated and re-alleged."  ECF 51 at 24 n.26 in Adv. Proc. No. 13-510.  As Judge Gordon saw it, the Howes' "strategy [was] to spin a tale suitable enough to delay things for as long as possible. . . ."  *Id.* at 25.  According to Judge Gordon, "the time for unwarranted, strategic delay (and frivolous claims) was over."  *Id.*

### F.  Appeal

The Notice of Appeal challenges two orders of the Bankruptcy Court: the MTD Order,

entered on May 12, 2014, Apx. 285-287, and the Reconsideration Order, entered on July 22, 2014. Apx. 297-298. As framed by plaintiffs, the appeal presents five issues for review, ECF 19 at 7-8, Second Amended Brief:

> 1. Did the bankruptcy court err in looking beyond the four corners of the Complaint, when ruling on Defendants' motions to dismiss, relying on patently false and defective ownership documents provided by Defendant Carrington, at the court's direction, to prove its right to enforce Plaintiffs' Note, and rejecting Plaintiffs' allegations of misrepresentation and fraudulent intent?

> 2. Did the bankruptcy court err in granting Defendants' motions to dismiss for failure to state claims upon which relief can be granted, and dismissing all nine counts of the Complaint, including Counts 2 and 9 although not all Defendants requested their dismissal, since there were other plausible claims for relief that were independent of fraud or trust termination?

> 3. Did the bankruptcy court err in dismissing, without leave to amend, Plaintiffs' fraud on the court count (Count 1) for failure to state a valid claim, holding that trust termination did not affect the trust's standing to enforce Plaintiffs' mortgage, and that Defendants did not act with fraudulent intent?

> 4. Did the bankruptcy court err, when ruling on Defendants' motions to dismiss, in finding that the trust holding Plaintiffs' mortgage did not cease to exist before Wells Fargo executed and filed multiple documents on its behalf, including the Second Foreclosure Case, Objection to Plan Confirmation, and the purported assignment of the Deed of Trust dated October 30, 2013?

> 5. Did the bankruptcy court err in directing Plaintiffs to omit, when amending the Complaint, any reference to fraud or misrepresentation arising from the lack of standing to foreclose or file bankruptcy claims by the trust that held Plaintiffs' mortgage?

According to the Howes, in light of the Trust's termination, none of the adversary proceeding defendants has standing to enforce the Note, initiate a foreclosure, object to the Chapter 13 plan, or file a proof of claim in the bankruptcy case. In plaintiffs' view, US Bank and Wells Fargo committed fraud in the foreclosure proceedings and in the bankruptcy case by representing that they are entitled to enforce the Note on behalf of the Trust. The Howes also insist that Christiana and Carrington committed fraud by attempting to prosecute the Amended

Claim in the bankruptcy case.  Thus, the Howes contend that the Bankruptcy Court erred in its dismissal of Count I, "Fraud Upon the Court," and in refusing to grant leave to amend, and also erred in its dismissal of the remaining counts of the Complaint.

In response, appellees argue that, even assuming the Note was removed from the Trust and the Trust was subsequently terminated, as plaintiffs allege, the Note remains enforceable and plaintiffs remain indebted to the holder of the Note.  Moreover, in appellees' view, the lack of physical possession of the Note is not dispositive of one's rights to enforce a negotiable instrument.  In addition, and as discussed, *infra*, defendants US Bank and Wells Fargo have moved to strike the Howes' Second Amended Brief. *See* ECF 20 ("Motion to Strike"); ECF 19 ("Second Amended Brief").

Additional facts are included in the Discussion.

## II.  Preliminary Matters
### A.      Jurisdiction

The MTD Order dismissed Count I of the Complaint, with prejudice, and Counts II through IX, without prejudice.  In the Reconsideration Order, the Bankruptcy Court declined to alter its rulings.  Because Counts II through IX were dismissed, without prejudice, I must first consider whether this Court has jurisdiction to review the Bankruptcy Court's orders on appeal. *See Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 345 (4th Cir. 2005) (stating that "we must initially determine whether we have [appellate] jurisdiction to consider the [ ] court's dismissal *without* prejudice") (emphasis in *Chao*).

On appeal of a bankruptcy court's order, the district court has jurisdiction pursuant to 28 U.S.C. § 158(a). *Wellness Int'l Network, Ltd. v. Sharif*, ____ U.S. ____, 135 S. Ct. 1932, 1940 (2015) (acknowledging that bankruptcy court rulings are "subject to appellate review by the district court"); *see also Mort Ranta v. Gorman*, 721 F.3d 241, 250 (4th Cir. 2013) (recognizing

the district court's capacity as a bankruptcy appellate court); *In re Kirkland*, 600 F.3d 310, 314

(4th Cir. 2010) (same).  Section 158(a) provides, in relevant part (emphasis added):

> The district courts of the United States shall have jurisdiction to hear appeals[ ]
>
> > (1) from *final* judgments, orders, and decrees;
> >
> > (2) from interlocutory orders and decrees issued under section 1121(d) of title 11 increasing or reducing the time periods referred to in section 1121 of such title [in order to file a bankruptcy plan]; and
> >
> > (3) with leave of the court, from other interlocutory orders and decrees[.]

The Fourth Circuit discussed the appealability of bankruptcy court orders in *McDow v.*

*Dudley*, 662 F.3d 284 (4th Cir. 2011), stating, *id.* at 287:

> We have recognized as a general matter, as have other courts of appeals, that "the concept of finality in bankruptcy cases 'has traditionally been applied in a more pragmatic and less technical way . . . than in other situations.'" *In re Computer Learning Ctrs., Inc.*, 407 F.3d 656, 660 (4th Cir. 2005) (quoting *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1009 (4th Cir. 1986) (alteration in original)); *see also In re ASARCO, L.L.C.,* 650 F.3d 593, 599-600 (5th Cir. 2011); *In re Marcal Paper Mills, Inc.,* 650 F.3d 311, 314 (3d Cir. 2011); *Ritchie Special Credit Invs., Ltd. v. U.S. Trustee,* 620 F.3d 847, 852 (8th Cir. 2010); *In re McKinney,* 610 F.3d 399, 401-02 (7th Cir. 2010); *In re Rudler,* 576 F.3d 37, 43-44 (1st Cir. 2009). As we explained in *A.H. Robins Co.:*
>
> > The special or unique reason for this relaxed rule of appealability in bankruptcy is that "[b]ankruptcy cases frequently involve protracted proceedings with many parties participating. To avoid the waste of time and resources that might result from reviewing discrete portions of the action only after a plan of reorganization is approved, courts have permitted appellate review of orders that in other contexts might be considered interlocutory."
>
> 788 F.2d 994, 1009 (4th Cir.1986) (quoting *In re Amatex Corp.,* 755 F.2d 1034, 1039 (3d Cir. 1985)). Thus, because of the special nature of bankruptcy proceedings, which often involve multiple parties, claims, and procedures, the postponing of review by the district court and the court of appeals of discrete issues could result in the waste of valuable time and already scarce resources. *See id.* at 1009; *see also In re Northwood Props., LLC,* 509 F.3d 15, 21 (1st Cir. 2007). We have concluded, therefore, that "orders in bankruptcy cases may be immediately appealed if they finally dispose of discrete disputes within the larger case." *In re Computer Learning Ctrs., Inc.,* 407 F.3d at 660 (quoting *In re Saco Local Dev. Corp.,* 711 F.2d 441, 444 (1st Cir. 1983)).

Despite the "more pragmatic and less technical" conception of finality that applies with respect to a bankruptcy appeal, *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1009 (4th Cir. 1986) (internal quotations omitted), "an order must 'conclusively determine[ ] a separable dispute over a creditor's claim or priority,'" in order to be considered final. *In re Urban Broadcasting Corp.*, 401 F.3d 236, 247 (4th Cir. 2005) (quoting *In re Saco Local Dev. Corp.*, 711 F.2d 441, 445-46 (1st Cir. 1983) (alteration in *In re Urban Broadcasting Corp.*).   In other words, a final, appealable order is one that "finally dispose[s] of discrete disputes within the larger case." *In re Computer Learning Ctrs.*, 407 F.3d 656, 660 (4th Cir. 2005) (internal quotations omitted).

In *Young v. Nickols*, 413 F.3d 416 (4th Cir. 2005), the Fourth Circuit stated, *id.* at 418 (internal quotations and citations omitted):

> Generally, an order dismissing a complaint without prejudice is not an appealable final order under 28 U.S.C. § 1291 when the plaintiff could save his action by merely amending his complaint. However, if the grounds of the dismissal make clear that no amendment could cure the defects in the plaintiff's case, the order dismissing the complaint is final in fact, and appellate jurisdiction exists.

Here, the MTD Order dismissed with prejudice only one count of plaintiffs' Complaint, *i.e.*, Count I (Fraud Upon the Court).  Apx. 286.  As to counts II through IX, the MTD Order expressly dismissed the claims without prejudice, and permitted plaintiffs to file an amended complaint.  Apx. 287.  Likewise, in the Reconsideration Order, the Bankruptcy Court granted plaintiffs leave to file an amended complaint.   Apx. 298.  Nonetheless, when a plaintiff declines to amend and instead elects to "to stand on his or her complaint," the order may indeed possess the necessary finality because the plaintiff has "'waive[d] the right to later amend . . . .'" *In re GNC Corp.*, 789 F.3d 505, 511 n.3 (4th Cir. 2015) (quoting *Chao*, *supra*, 415 F.3d at 345).  According to the Fourth Circuit, if the plaintiff abandons the right to amend, [the court on appeal] treat[s] th[e] case as if it had been dismissed with prejudice and therefore [has] jurisdiction over this appeal." *In re GNC Corp*, 789 F.3d at 511 n.3.

Here, plaintiffs chose to stand on their initial Complaint; they declined to file an amended complaint. Therefore, notwithstanding that the MTD Order and the Reconsideration Order dismissed only one count with prejudice, and the remaining eight counts without prejudice, I am satisfied that this Court has jurisdiction to consider the appeal.

## B.    Motion to Strike

When the Howes filed their appeal, Rule 8009(a) provided that an appellant may file a brief within fourteen days of the docketing of the appeal. Once the appellee replied, "[n]o further briefs may be filed except with leave of the district court . . . ." Fed. R. Bankr. P. 8009(a)(3). Effective December 1, 2014, Fed. R. Bankr. P. 8009(a) was replaced by Fed. R. Bankr. P. 8018. Rule 8018 increased the time available to an appellant to file an initial brief, from fourteen days to thirty days after the docketing of the notice of appeal. *See also* Fed. R. Bankr. P. 8018 advisory comm. nn. (2014).

In the Motion to Strike, US Bank and Wells Fargo contend that plaintiffs' Second Amended Brief was improperly filed out of time, and without leave of Court, in violation of Fed. R. Bankr. P. 8009(a)(3). Moreover, they insist that acceptance of the brief "would be prejudicial to Appellees" to the extent "anything new has been added . . . ." ECF 20 at 3, Motion to Strike. They argue, *id.*:

> There is no procedural rule allowing an appellant to start the briefing process all over again after the appellant's brief, appellee's response, and appellant's reply have all been drafted and filed. Even more egregious is that Appellants' Second Amended Brief was submitted to the Court without a redlined version showing how it differs from their first Amended Brief. As each document is 50 pages long, it is inherently unreasonable to expect the Appellees to compare each and every line to determine what, if any, changes have been made.

In opposing the Motion to Strike, plaintiffs explain: "Appellants filed their Second Amended Brief (ECF 19) for the sole purpose of providing the Court with references to their

Appendix to Brief (ECF 9)."   ECF 22 ¶ 1, Opposition to Motion to Strike.  They contend: "Appellees benefitted from Appellants' Appendix and were able to refer to it when citing to the record in their briefs."   *Id.* ¶ 3.   In contrast, "[a]ppellants did not have the benefit of their Appendix when they prepared their brief, so all references to the record in their brief are to the Court's relevant ECF docket numbers. Appellants' Second Amended Brief was prepared and filed to correct this problem and assist the Court in finding the papers cited in Appellants' brief." *Id.* ¶ 4.  Plaintiffs further insist that "no substantive change was made to Appellants' brief with the subject amendment . . . ."  *Id.* ¶ 5.  In this regard, they attached a redline to their Opposition to Motion to Strike, reflecting the differences between the Second Amended brief and the initial amended brief.  ECF 22-1.

To be sure, plaintiffs should have requested leave of Court to file the Second Amended Brief.  Nonetheless, because there is no substantive change in the Second Amended Brief, and no actual prejudice resulted from its filing, I will deny the Motion to Strike (ECF 20).

### C.      Standards of Review

### 1.  Role of District Court

The MTD Order of May 12, 2014, granted defense motions to dismiss the Complaint filed in the adversary proceeding.  The Reconsideration Order of July 22, 2014, denied plaintiffs' motions to reconsider.

The standard of review of a bankruptcy appeal in district court is the same standard used when an appellate court reviews a district court proceeding. *See* 28 U.S.C. § 158(c)(2) (providing that a bankruptcy appeal "shall be taken in the same manner as appeals in civil proceedings generally are taken to the courts of appeals from the district courts . . . ."); *see also In re Slaey*, No. 1:14CV1210, 2015 WL 5139317, at *3 (E.D. Va. Sept. 1, 2015) (citing 28 U.S.C.

§ 158(c)(2); *Haynes v. Stephenson*, No. 3:14-CV-352-MGL, 2015 WL 687133, at *3 (D.S.C. Feb. 18, 2015) (same); *Alexander v. Barnwell Cnty. Hosp.*, No. CIV.A. 1:13-02164, 2014 WL 607499, at *3 (D.S.C. Feb. 18, 2014) (same).

Accordingly, the district court reviews the bankruptcy court's findings of fact under the "clear error" standard.  *In re Taneja,* 743 F.3d 423, 429 (4th Cir. 2014); *Mort Ranta*, *supra*, 721 F.3d at 250.  A finding of fact is clearly erroneous when the record demonstrates convincingly to the reviewing court that "a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948); *see United States v. Hall*, 664 F.3d 456, 462 (4th Cir. 2012).  The bankruptcy court's conclusions of law are subject to de novo review.  *In re Taneja*, 743 F.3d at 429; *In re Kirkland*, 600 F.3d 310, 314 (4th Cir. 2010); *In re Biondo*, 180 F.3d 126, 130 (4th Cir. 1999).  "On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy court's judgment, order, or decree or remand with instructions for further proceedings." *Harman v. Levin*, 772 F.2d 1150, 1153 n.3 (4th Cir. 1985) (internal quotations omitted); *see also In re LightSquared, Inc.*, 534 B.R. 522, 525 (S.D.N.Y. 2015) (recognizing, *inter alia¸* the district court's power to remand with instructions for further proceedings).

In Count III, plaintiffs sought sanctions against defendants.   "A bankruptcy court's decision to impose [or deny] sanctions [ ] is within its sound discretion and is, therefore, reversible only if that discretion has been abused."  *In re Nat'l Heritage Found., Inc.*, 510 B.R. 526, 541 (E.D. Va. 2014) *aff'd sub nom. Miller v. Nat'l Heritage Found.*, Inc., 599 F. App'x 107 (4th Cir. 2015); *see also In re Glasco*, 321 B.R. 695, 699 (W.D.N.C. 2005).

Fed. R. Civ. P. 59 governs a motion to amend judgment and is applicable in bankruptcy court pursuant to Fed. R. Bankr. P. 9023.   Fed. R. Civ. P. 60(b) is made applicable in bankruptcy proceedings pursuant to Fed. R. Bankr. P. 9024.   On appeal, a bankruptcy court's denial of a

motion for reconsideration is reviewed for abuse of discretion.  *See In re Burnley*, 988 F.2d 1, 3 (4th Cir. 1992); *see also In re Castillo*, No. TDC-14-0924, 2015 WL 789095, at *7 (D. Md. Feb. 23, 2015); *Fuentex v. Stackhouse*, 182 B.R. 438, 442 (E.D. Va. 1995).

### 2.  Fed. R. Bankr. P. 7008 and 7012; Fed. R. Civ. P. 12(b)(6)

Defendants' motions to dismiss the Complaint were predicated on Fed. R. Bankr. P. 7012(b) and Fed. R. Civ. P. 12(b).[38]  According to Fed. R. Bankr. P. 7012(b), Fed. R. Civ. P. 12(b) applies in adversary proceedings.  And, pursuant to Fed. R. Bankr. P. 7008, Fed. R. Civ. P. 8 also applies in adversary proceedings.

Under Fed. R. Civ. P. 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  If the pleader fails to do so, then a defendant may file a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Bankr. P. 7012,w hich essentially incorporates Fed. R. Civ. P. 12.

A defendant may test the sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6).  *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."  Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  The purpose of the rule is to provide the defendant with "fair notice" of the claim and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 n.3 (2007) (quotations omitted).  A Rule 12(b)(6) motion will be granted if the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct . . . ."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotations omitted).

---

[38] The motions were also predicated on Fed. R. Bank. P. 7009, discussed *infra*.

A plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).

*Twombly*, 550 U.S. at 555.   Moreover, courts "do not countenance dismissal of a complaint for

imperfect statement of the legal theory supporting the claim asserted."   *Johnson v. City of Shelby,*

*Miss.*, ____ U.S. ____, 135 S. Ct. 346, 346 (2014) (per curiam).   But, the rule demands more

than bald accusations or mere speculation.   *Twombly,* 550 U.S. at 555; *see Painter's Mill Grille,*

*LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013).   To satisfy the minimal requirements of Rule

8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a

cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . .

recovery is very remote and unlikely."   *Twombly*, 550 U.S. at 556 (internal quotations omitted).

In other words, the complaint must contain facts sufficient to "state a claim to relief that is

plausible on its face."   *Iqbal*, 556 U.S. at 678 (internal quotations omitted); *see Houck v.*

*Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Simmons v. United Mortg. & Loan*

*Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011).

In reviewing a Rule 12(b)(6) motion, a court "'must accept as true all of the factual

allegations contained in the complaint,'" and must "'draw all reasonable inferences [from those

facts] in favor of the plaintiff.'"   *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d

435, 440 (4th Cir. 2011) (citation omitted); *see Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th

Cir.), *cert. denied*, ____ U.S. ____, 132 S. Ct. 402 (2011); *Brockington v. Boykins*, 637 F.3d 503,

505 (4th Cir. 2011).   However, a complaint that provides no more than "labels and conclusions,"

or "a formulaic recitation of the elements of a cause of action" is insufficient.   *Twombly*, 550

U.S. at 555.   Moreover, the court is not required to accept legal conclusions drawn from the

facts.   *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Monroe v. City of Charlottesville, Va.*,

579 F.3d 380, 385-86 (4th Cir. 2009).

A motion asserting failure to state a claim typically "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards*, *supra*, 178 F.3d at 243 (quotation marks omitted); *Tobey v. James*, 706 F.3d 379, 387 (4th Cir. 2013). But, on occasion, a defense can be resolved on the basis of the facts alleged in the complaint. "This principle only applies, however, if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint*,'" or in other documents that are proper subjects of consideration under Rule 12(b)(6). *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc) (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)) (alteration and emphasis in *Goodman*).

A court's consideration of a Rule 12(b)(6) motion is generally confined to facts alleged in the operative pleading.  "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought.  *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert. denied*, ____ U.S. ____, 132 S. Ct. 1960 (2012).

Ordinarily, a court considering a motion to dismiss "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Cahaly v. Larosa*,  796 F.3d 399, 405 (4th Cir.).  If a court considers material outside of the pleadings, "the motion must be treated as one for summary judgment under Rule 56," in which case "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).  Under certain limited exceptions, however, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary

judgment.  *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 506 (4th Cir. 2015).

To illustrate, a court may properly consider documents attached or incorporated into the complaint, as well as documents attached to the defendant's motion, "'so long as they are integral to the complaint and authentic.'"  *U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (quoting *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see also Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014).  To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains,* gives rise to the legal rights asserted.'"  *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in *Chesapeake*).  In addition, without converting a motion under Rule 12(d), "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'"[39] *Goldfarb*, *supra*, 791 F.3d at 508; *see* Fed. R. Evid. 201(b)(stating that a "court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *see also* Tellabs, *Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir.), *cert. denied*, ____ U.S. ____, 132 S. Ct. 115 (2011); *Philips*, *supra*, 572 F.3d at 180.

Plaintiffs attached multiple exhibits to their Complaint.  *See* note 8, *supra*.  Defendants did not dispute the authenticity of these documents.  Moreover, because they were incorporated into the Complaint and integral to it, the Bankruptcy Court was entitled to consider them.

---

[39] "Adjudicative facts are simply the facts of the particular case." Fed. R. Evid. 201, ADVISORY COMMITTEE'S NOTES.

### 3.   Fed. R. Civ. P. 9(b)

The Complaint lodges claims of fraud. These allegations implicate the heightened pleading standard under Fed. R. Civ. P. 9, which is applicable to adversary pleadings within a bankruptcy case.   *See* Fed. R. Bankr. P. 7009 (stating that "Rule 9 F.R.Civ.P. applies in adversary proceedings").   Fed. R. Civ. P. 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *See, e.g.*, *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013) (stating that a Maryland Consumer Protection Act claim that "sounds in fraud, is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b)"); *E–Shops Corp. v. US Bank N.A.*, 678 F.3d 659, 665 (8th Cir. 2012) ("Rule 9(b)'s heightened pleading requirement also applies to statutory fraud claims.").

Under Rule 9(b), a plaintiff alleging claims that sound in fraud "'must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *United States ex rel. Owens v. First Kuwaiti Gen'l Trading & Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010) (citation omitted). In other words, "'Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story.'" *Crest Construction II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011) (citation omitted).   As Judge Gordon put it:   "The rule is intended to discourage a 'sue first, ask questions later' philosophy.   *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441 (7th Cir. 2011)."   ECF 51 at 17 in Adv. Proc. No. 13-510, Memorandum Opinion of November 5, 2014.

Rule 9(b) serves several salutary purposes.  In *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 784 (4th Cir. 1999), the Fourth Circuit said (quoting *U.S. ex rel. Stinson,*

*Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield of Georgia, Inc.*, 755 F. Supp. 1055, 1056-57 (S.D. Ga. 1990) (alteration in *Harrison*)):

> First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . . Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

However, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Harrison*, 176 F.3d at 784. Moreover, Rule 9(b) is "less strictly applied with respect to claims of fraud by concealment" or omission of material facts, as opposed to affirmative misrepresentations, because "an omission 'cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation.'" *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F.Supp. 539, 552 (D. Md. 1997) (citation omitted); *accord Piotrowski v. Wells Fargo Bank, N.A.*, No. DKC 11–3758, 2013 WL 247549, at *5 (D. Md. Jan. 22, 2013).

### D.     Choice of Law

This case involves principles of both state and federal law. Nevertheless, the parties have not addressed the matter of choice of law. Rather, the parties have briefed the issues as if substantive Maryland law governs the state law claims, with little discussion or analysis as to the applicable choice of law principles.

The Fourth Circuit provided guidance in *Compliance Marine, Inc. v. Campbell* (*In re Merritt Dredging Co.*), 839 F.2d 203, 205 (4th Cir.1988).

> The question of what choice of law rules should be applied by a bankruptcy court presents another wrinkle. Although bankruptcy cases involve

42

federal statutes and federal questions, a bankruptcy court may, as here, face situations in which the applicable federal law incorporates matters which are the subject of state law. It is clear that a federal court in such cases must apply state law to the underlying substantive state law questions.

In *Biegler v. Heep*, 172 F.3d 43 (4th Cir. 1999) (per curiam), the Fourth Circuit observed that, when it reviews a bankruptcy proceeding on appeal, it is ordinarily "required to apply the choice of law rules of the forum state . . . ." *Id.* at *3 n.1; *see also McCarthy v. Giron*, No. 1:13-CV-01559-GBL, 2014 WL 2696660, at *10 (E.D. Va. June 6, 2014); *Johnson v. Carmax, Inc.*, No. 3:10-CV-213, 2010 WL 2802478, at *2 (E.D. Va. July 14, 2010).   Therefore, the law of Maryland, the forum state, guides this Court's choice-of-law analysis.   *Chattery Int'l, Inc. v. JoLida, Inc.*, No. WDQ–10–2236, 2012 WL 1454158, at *3 n.10 (D. Md. Apr. 24, 2012) ("Federal courts with supplemental jurisdiction over a state law claim apply the choice of law rules of the forum state."); *Baker v. Antwerpen Motorcars Ltd.*, 807 F.Supp.2d 386, 389 n.13 (D. Md. 2011) ("In a federal question [claim] that incorporates a state law issue, . . . a district court applies the choice-of-law rules of the state in which it sits unless a compelling federal interest directs otherwise.").

Insofar as the Complaint alleges common law fraud, such claims sound in tort.   *See J.C. Driskill, Inc. v. Abdnor*, 901 F.2d 383, 386 (4th Cir. 1990) ("A cause of action for breach of a duty imposed by statute or case law, and not by contract, is a tort action.").   In tort cases, Maryland courts apply the doctrine of *lex loci delicti, i.e.*, the law of the "place of the alleged harm."   *Proctor v. Wash. Metro. Area Transit Auth.*, 412 Md. 691, 726, 990 A.2d 1048, 1068 (2010).   Because the alleged injuries occurred in Maryland, I will look to Maryland law with respect to plaintiffs' tort claims.   To the extent the Complaint includes an Objection to Claim, as explained in the Discussion of Count IX, the existence of such a claim is controlled by Maryland law, but the allowance of such a claim is governed by federal law.

With respect to the issues surrounding the termination of the Trust, at the hearing on January 6, 2014, Judge Gordon asked counsel for Wells Fargo if Maryland law applies to the Trust termination issue.  Counsel for Wells Fargo stated:  "It may not be Maryland Law."  Apx. at 334.  Judge Gordon also expressed doubt that Maryland law controls.  At the hearing on March 4, 2014, he said, Apx. 214:

> I wondered whether Maryland law even applied to the transaction, knowing that it would be unlikely that the great minds that fashioned these securitization trusts and set up all of these transactions that led to the worst economic disaster since the Great Depression probably wouldn't look to Maryland law to figure out what it all meant, if that became necessary.

Ultimately, Judge Gordon concluded that, in view of *Jaimes v. JPMorgan Chase Bank, N.A.*, No. 12-C 3162, 2013 WL 677740 (N.D. Ill. Feb. 25, 2013), discussed *infra*, the choice of law issue was inconsequential as it related to termination of the Trust.  Apx. 214, Hearing of March 4, 2014; *see also Jaimes*, 2013 WL 677740, at *4-*5 (concluding that the debtor-creditor relationship created by the execution of a note remains unchanged, notwithstanding securitization of the note, the creation of a trust whereby multiple notes are pooled together, or the subsequent termination of the trust).

As to the Trust termination, the parties relied upon Maryland law and did not identify any relevant legal principles that might differ in other jurisdictions.  Maryland choice-of-law principles contain guidance for courts when the parties fail to address adequately a choice-of-law issue.  In *Chambco, Div. of Chamberlin Waterproofing & Roofing, Inc. v. Urban Masonry Co.*, 338 Md. 417, 421, 659 A.2d 297, 299 (1995), the Maryland Court of Appeals said (citations omitted):

> Where the parties to an action fail to give . . . notice of an intent to rely on foreign law, and where it is clear that one or more issues in the case are controlled by another jurisdiction's law, a court in its discretion may exercise one of two choices with respect to ascertaining the foreign law. First, the court may presume

that the law of the other jurisdiction is the same as Maryland law. Alternatively, the court may take judicial notice of the other state's law. This discretion may be exercised by either the trial court, or by an appellate court . . . .

*Accord Felland Ltd. P'ship v. Digi–Tel Commc'ns, LLC,* 384 Md. 520, 530 n.1, 864 A.2d 1027, 1033 n.1 (2004).

Therefore, in accordance with *Chambco*, I will assume that, to the extent the law of any other jurisdiction ought to govern the issue of the Trust termination, it is the same as the law of Maryland. *See Ohio Sav. Bank v. Progressive Cas. Ins. Co.*, 521 F.3d 960, 962 (8th Cir. 2008) ("Like the district court, we will ignore what might be a complex choice of law analysis because the parties have not identified a relevant state law conflict . . . ."); *Cleaning Auth., Inc. v. Neubert*, 739 F. Supp. 2d 807, 820 (D. Md. 2010) ("'Choice-of-law analysis becomes necessary . . . only if the relevant laws of the different states lead to different outcomes.'") (citation omitted).

## III.  Discussion

### A.       Termination of the Trust

Before addressing the Bankruptcy Court's dismissal of all nine counts, I turn to plaintiffs' threshold contention, underpinning many of their claims:  termination of the Trust precluded the adversary defendants from taking any action to enforce the Note.  If plaintiffs' foundational argument is erroneous, plaintiffs' claims of liability begin to unravel.

The fraud claim in Count I is based on the pursuit of the mortgage debt by US Bank and Wells Fargo, without disclosure that the Trust had terminated in January 2012.  In Count II, requesting a "Determination of Scope, Extent and Validity of Lien," Apx. 41, Complaint at 20, plaintiffs sought a ruling that the Note is unenforceable, and that no party had standing to file a secured claim against the Property because of the termination of the Trust.  Apx. 42, Complaint

¶ 85.   Count VI, alleging violations of the FDCPA, rests on the notion that because the Note was not assigned prior to the termination of the Trust, Wells Fargo, US Bank, and Christiana cannot claim ownership of the Note on behalf of the Trust.   In Count VII, which alleges violations of the MCDCA, plaintiffs contend that Wells Fargo, US Bank, and Christiana sought to collect amounts to which they knew they were not entitled.   Similarly, in Count VIII, in which plaintiffs allege violations of MCPA, the Howes maintain that Wells Fargo and US Bank improperly concealed the termination of the Trust.   Finally, Count IX, plaintiffs' "Objection to Claim," asserts, *inter alia*, that US Bank and Wells Fargo lack standing to file the Amended Claim due to the Trust's termination.   Apx. 54, Complaint at 33.

On appeal, the Howes contend that the Bankruptcy Court improperly ruled that the Trust's termination "did not affect" the defendants' right to enforce the Note.   ECF 19 at 7, Second Amended Brief.   Plaintiffs frame their challenge as one of "standing."   In plaintiffs' view, because the Trust ceased to exist, Wells Fargo and US Bank lacked standing to enforce the Note and to prosecute the Amended Claim.   And, because Wells Fargo and US Bank lacked standing, plaintiffs contend that any assignment of interest in the Note from Wells Fargo and US Bank to Christiana and Carrington was invalid. Apx. 41-42, Complaint ¶¶ 74-97.   According to the Howes, it follows that Christiana and Carrington lack standing to enforce the Note in the Chapter 13 case through the Amended Claim.

Appellees rely on *Jaimes v. JPMorgan Chase Bank, N.A.*, *supra*, 2013 WL 677740, to challenge the Howes' position.   In *Jaimes*, plaintiffs Roberta and Beata Jaimes entered a loan agreement with Washington Mutual Bank, F.A. ("WaMu") and executed a promissory note secured by a mortgage on certain property in Illinois.   *Id.* at *1.   The loan agreement designated WaMu as the servicer of the loan.   *Id.*   On May 1, 2004, WaMu transferred the note and

mortgage to a mortgage-backed securities trust ("WaMu Trust"), *id.*, which pooled together nineteen other Illinois mortgage loans. *Id.* at *3. Under the terms of the WaMu Trust, WaMu retained possession of the note and mortgage as custodian for the WaMu Trust. *Id.* at *1. WaMu also retained servicing rights for those loans held by the WaMu Trust. *Id.* Less than a year later, on March 30, 2005, the WaMu Trust was terminated. *Id.*

In 2008, JPMorgan Chase Bank, N.A. ("Chase") sent several bills to the plaintiffs, in which Chase represented that it was the creditor and the servicer of the plaintiffs' note and mortgage. *Id.* In response, plaintiffs paid several bills. *Id.* On September 25, 2008, the Federal Deposit Insurance Corporation ("FIDC") was named receiver of the WaMu Trust. *Id.* On the same date, Chase and the FDIC entered into an agreement by which Chase purchased "'all right, title, and interest of the Receiver in and to all of the assets'" of WaMu and its subsidiaries. *Id.* (quoting purchase agreement). The purchase agreement also stated that Chase "'specifically purchases all mortgage servicing rights and obligations of [WaMu].'" *Id.* (quoting purchase agreement) (alteration in *Jaimes*).

On August 8, 2011, a law firm sent a letter to plaintiffs, in "'an attempt to collect a debt.'" *Id.* at *2 (quoting the complaint). The letter indicated that the law firm "represents the holder of a Mortgage and Note" for plaintiffs' house. *Id.* at *2. The letter also identified Chase as the creditor and servicer of the note. *Id.* Then, on August 11, 2011, Chase initiated a foreclosure proceeding to enforce the note. *Id.*

Thereafter, in April 2012, plaintiffs filed suit against Chase, alleging, *inter alia*, FDCPA violations. According to the plaintiff, Chase never acquired an interest in the note, and thus its attempts to collect payments were fraudulent. In plaintiffs' view, the WaMu Trust was terminated on March 30, 2005, and its assets "'were distributed to the certificate-holders of the

Trust"' such that the certificate-holders '"became the only mortgagees, the only owners and legal holders of the Note and the Mortgage.'" *Id.* at *4 (quoting the complaint).    Because termination resulted in a distribution of the WaMu Trust assets to certificateholders, plaintiffs argued that neither WaMu nor its successor-in-interest, Chase, had authority to collect mortgage payments, assign the note or mortgage, or foreclose on the note. *Id.* at *2, *4.

Chase moved to dismiss.   *Id.* at *2.   In resolving the motion, the court considered the effect of the WaMu Trust's termination on the ability of WaMu and Chase to service the mortgage.

The *Jaimes* Court rejected plaintiffs' theory that their loan obligation terminated upon the termination of the WaMu Trust because the servicing rights were not sold or transferred prior to termination of the WaMu Trust.   *Id.* at *4.   The *Jaimes* Court emphasized that "a trust's termination does not terminate the payment obligations on the mortgages in the trust." *Id.*   It explained further: "A mortgage-backed securitization trust, like the Trust here, merely holds a group of mortgage loans. The process of grouping mortgage loans into a security held by a trust, known as securitization, does not change the underlying loan obligations of the borrowers whose mortgages comprise the trust." *Id.*   In other words, pooling mortgages together into a trust does not in any way eradicate or modify the borrower's underlying obligation to pay on the note.

The court also explained that termination of the WaMu Trust was immaterial because plaintiffs "do not argue that they were billed twice for the same loan payment obligation beginning in September 2008, nor do they contend that Chase failed to credit them for the payments they made to Chase after Chase billed them." *Id.* at *5.   The court reasoned that, in the absence of two masters claiming ownership of the note, "it is reasonable for the Court to infer that the servicing rights on Plaintiffs' debt transferred from WaMu to Chase pursuant to the P &

A Agreement in September 2008." *Id.*

In sum, the *Jaimes* Court found that "it is insufficient for Plaintiffs to plead that the Trust's termination destroyed WaMu's servicing rights and that Chase, as successor-in-interest to WaMu, fraudulently serviced the debt beginning in September 2008, without offering any allegation as to who became the servicer of their debt upon the Trust's termination." *Id.* On this ground, the court concluded that Chase had a right to service the loan, notwithstanding the trust termination, and it dismissed the claims as to Chase.

The Howes dispute the significance of *Jaimes*. They maintain that the case is not "binding precedent" and insist the facts here are distinguishable. ECF 19 at 21, Second Amended Brief. The Howes highlight that in *Jaimes*, it was Chase, as a creditor and the servicer of the mortgage, that filed the foreclosure suit. *Id.* at 22. In plaintiffs' view, because the foreclosure action in that case was initiated by the servicer, the significance of *Jaimes* is limited to determining rights of a mortgage servicer upon trust termination and does not speak to the rights of a trustee seeking to enforce an instrument owned by a terminated trust. The Howes maintain that *Jaimes* is inapplicable because the Second Foreclosure Case was initiated by the substitute trustee on behalf of the Trust, and not by Wells Fargo as the servicer. *Id.* at 21-22.

The Howes' view of *Jaimes* is too narrow. Although the focus of *Jaimes* was indeed the effect of the trust termination on servicing rights, the case is nonetheless pertinent. It demonstrates that a borrower's obligation to pay his or her mortgage may survive securitization of the instrument and the subsequent termination of the investment trust. *Jaimes*, 2013 WL 677740, at*4-5.

Indeed, numerous cases establish that, "[a]s a matter of law, securitization alone does not render a note or deed of trust unenforceable and does not alter a borrower's obligation to pay

back his or her loan." *Dauenhauer v. Bank of New York Mellon*, No.12-CV-01026, 2013 WL 2359602, at *5 (M.D. Tenn. May 28, 2013), *aff'd*, 562 F. App'x 473 (6th Cir. 2014); *see, e.g.*, *Beasley v. FV-I, Inc.*, No. 1:13-CV-116 JCC/TRJ, 2013 WL 1192018, at *4 (E.D. Va. Mar. 21, 2013) (". . . Plaintiff also complains that the subject Note has been securitized and therefore rendered unenforceable as to him. Plaintiff presents no plausible legal argument to bolster this assertion. Whether or not there has been transfer of the Loan, there are no facts alleged which would relieve Plaintiff of his obligation to pay."); *Upperman v. Deutsche Bank Nat. Trust Co.*, No. CIVA 01:10-CV-149, 2010 WL 1610414, at *2 (E.D. Va. Apr. 16, 2010) ("There is no legal authority that the sale or pooling of investment interest in an underlying note can relieve borrowers of their mortgage obligations or extinguish a secured party's rights to foreclose on secured property."); *see Reyes v. GMAC Mortg. LLC*, 2011 WL 1322775, at *2 (D. Nev. April 5, 2011) ("[F]ive of plaintiffs' claims are based on the idea that securitization inherently changes the existing legal relationship between the parties to the extent that the original parties cease to occupy the roles they did at the closing . . . . This argument has been rejected [ ] because the securitization of a loan does not in fact alter or affect the legal beneficiary's standing to enforce the deed of trust.") (internal quotations omitted); *see also In re Nordeen*, 495 B.R. 468, 478-79 (B.A.P. 9th Cir. 2013) (collecting cases).

*Deutsche Bank v. Brock*, 430 Md. 714, 63 A.3d 40 (2013), is informative.  There, the borrower challenged the authority of various individuals and entities to foreclose on her residence. She alleged, *inter alia*, that the trust holding the note had ceased to exist and, therefore, no longer owned the note.  *Id.* at 722-23, 63 A.3d at 44.  The borrower insisted that, "regardless of which entity is the holder of the Note, only the owner may enforce the Note and bring an action to foreclose." *Id.* at 730, 63 A.3d at 49.  Relying on Maryland Code, C.L. § 3-

203,[40] the Maryland Court of Appeals stated: "'The right to enforce an instrument and ownership of the instrument are two different concepts.'"  *Id.* at 730, 63 A.2d at 49 (quoting Comment to C.L. § 3-203).  It reasoned, *id.* at 731, 63 A.3d at 50: "Here, Brock does not contend that she does not know to which entity her payments are due, and thus, the question of which entity owns the Note is irrelevant to the resolution of the present case."  As in *Jaimes*, the *Brock* Court concluded that "whether the Trust is (or is not) the owner of the Note is irrelevant for present purposes."  *Id.* at 732-33, 63 A.3d at 51.

In this case, the Note was securitized and pooled with other notes in a mortgage-backed Trust.  In April 2009, the Howes defaulted on the Note, although they made some partial payments through August 2009.  Apx. 26, Complaint ¶ 17; *see e.g.*, ECF 51 at 22-25 in Adv. Proc. No. 13-510.  The Howes insist that on January 1, 2012, "[t]he Mortgage was removed from the Trust" and, according to plaintiffs, its assets were distributed to certificateholders.  *Id.*  By January 25, 2012, the Trust ceased to exist.  *Id.*

I recognize that the dispute here arises due to the termination of the Trust, and not its creation through the securitization process.  Nonetheless, in view of *Brock*, *Dauenhauer*, *Beasley*, *Upperman*, and *Reyes*, among other cases, it follows logically that the "unpooling" of the instruments upon the Trust's termination would not disturb the underlying responsibility of the Howes to pay the obligation due on the instruments.  In other words, as Judge Gordon explained, the termination of the Trust did not relieve the Howes of their obligations under the Note or the Deed of Trust.  The termination of the Trust, standing alone, did not render unenforceable the instruments held by the Trust prior to its termination.

---

[40] As noted, C.L. is an abbreviation for the Commercial Law Article of the Maryland Code.

Accordingly, I agree with the Bankruptcy Court that the termination of the Trust, in and of itself, did not affect the enforceability of the Note or the Deed of Trust. Whether the instruments remained enforceable after termination of the Trust, and which party, if any, has "standing" or the right to enforce them, are two distinct questions, as discussed, *infra*.

As mentioned, plaintiffs' contention that the termination of the Trust precluded any claim or action to enforce the Note is the foundational argument upon which most of plaintiffs' claims rise and fall. I have rejected the underlying premise. Like a house of cards, many of plaintiffs' claims quickly collapse. I address below the ripple effect on each claim.

## B.     Count I -- Fraud Upon the Court

Count I, filed only against Wells Fargo and US Bank, is titled "Fraud Upon the Court." On appeal, plaintiffs ask: "Did the bankruptcy court err in dismissing, without leave to amend, Plaintiffs' fraud on the court count (Count 1) for failure to state a valid claim . . . .[?]" ECF 19 at 7, Second Amended Brief.[41]

The Howes complain in Count I that they "do not know the identity of the rightful owner of the Note" (Apx. 38, Complaint ¶ 62), because "the Mortgage was removed from [the] Trust on January 1, 2012, and the Trust terminated and ceased to exist on January 25, 2012, before the Second Foreclosure Case was filed . . . ." Apx. 33, Complaint ¶ 43. Appellants also allege that Wells Fargo "falsely filed its Amended Claim in the present case on March 15, 2013, misrepresenting its identity as 'Creditor' . . . and conceding the fact that the trust had not existed since January 25, 2012." ECF 19 at 11, Second Amended Brief (citing Complaint, [Apx. 39] ¶¶ 67-68). The Howes assert, ECF 19 at 20, Second Amended Brief:

---

[41] Count I was filed pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9011. Apx. 38, Complaint. Section 105 permits the Bankruptcy Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." And, Fed. R. Bankr. P. 9011 is the bankruptcy equivalent of Fed. R. Civ. P. 11.

. . . Wells Fargo engaged in executing and filing false documents in the name of the non-existent trust, in the bankruptcy court and [State] circuit court, and attempting to mislead the circuit court into believing that any proceeds awarded in the foreclosure would convey to the benefit of the trust investors, even though that was an impossibility. Appellants further allege that Wells Fargo now falsely misrepresents itself as the secured creditor in the present case, and continues to execute false documents used as evidence in this proceeding (see 2013 Trust Assignment, ECF 1-37 at 29 (Apx. 278), discussed infra under Count 2), in an attempt to abuse the judicial process and collect a debt that is not due it.

At the hearing on July 16, 2014, Judge Gordon asked counsel for plaintiffs:  "So, is [Count I] fraud on the Court or is it fraud on your client?"  Apx. 358.  Counsel for plaintiffs replied:  "Well, it really is both."  *Id.*  But, counsel added that Count I "sounds primarily as fraud on the Court."  *Id.*  Judge Gordon twice asked plaintiffs' counsel: "What are you going to prove in support of fraud?"  Apx. 356-67; Apx. 357.  Plaintiffs' lawyer responded, Apx. 357:  "I would prove that the trust terminated.  That US Bank as trustee no longer owned the note.  That US Bank and Wells Fargo were aware of that fact.  That they sought to hide it. . . . [i]n order to get paid for their foreclosure fees and costs.  I would submit that would be the primary reason."

In addition, plaintiffs' counsel explained that his clients were "damaged" (Apx. 357) "[b]y having to demonstrate to the Court that this claimant is not entitled to foreclosure fees and costs.  And that it doesn't have standing."  Apx. 358.  "Basically," said plaintiffs' counsel, "that is it."  *Id.*

Based on the record, it is plain that there was some uncertainty as to the party legally entitled to enforce the Note.  According to Judge Gordon, this confusion occurred, in part, due to "sloppiness" and "bumbling" by Wells Fargo and US Bank.  Apx. 226.  For instance, the Kennerty Affidavits submitted in the First Foreclosure Case to establish US Bank's right to enforce the Note proved to be affirmations made without any personal knowledge of the facts stated therein.  Apx. 32, Complaint ¶ 39.  Similarly, Dore apparently did not sign the Dore

Affidavits submitted in the First Foreclosure Case, contrary to the representations in the affidavits. Apx. 32, Complaint ¶ 38.  As a result, the First Foreclosure Case was dismissed. Apx. 32, Complaint ¶ 40.

Wells Fargo and US Bank concede that their own carelessness has contributed to confusion in this case.  For example, they acknowledge that their counsel failed to differentiate between Wells Fargo as the servicer and US Bank as the owner of the Note.  They explain, ECF 11 at 18 n.10, Wells Fargo Brief:

> In the Memorandum in Support of Motion to Dismiss, counsel for U.S. Bank and Wells Fargo confused his clients' respective roles, drew no distinction between the owner of the Note and its holder, and argued that Wells Fargo acquired Appellants' loan in 2012. See, e.g., Appendix, pp. 85-90. However, as the bankruptcy court correctly discerned, U.S. Bank was the holder, and Wells Fargo the servicer, at all times relevant to the Complaint.

Notwithstanding such missteps or errors, plaintiffs have not alleged facts that amount to fraud upon the court.

To be sure, a precise definition of "fraud on the court" is "elusive." *Great Coastal Exp., Inc. v. Int'l Bhd. of Teamsters, Chauffeurs*, *Warehousemen & Helpers of Am.*, 675 F.2d 1349, 1356 (4th Cir. 1982).  It is a "nebulous concept" that is "construed very narrowly . . . ."  *Id.* Clearly, it "is not your 'garden variety fraud.'"  *Fox ex rel. Fox v. Elk Run Coal Co.*, 739 F.3d 131, 135 (4th Cir. 2014) (citation omitted).  As the Fourth Circuit has explained, *id.* at 136, "not only must fraud on the court involve an intentional plot to deceive the judiciary, but it must also touch on the public interest in a way that fraud between individual parties generally does not."

Moreover, "this doctrine should be invoked only when parties attempt 'the more egregious forms of subversion of the legal process . . . , those that we cannot necessarily expect to be exposed by the normal adversary process.'"  *Fox*, 739 F.3d at 136 (quoting *Great Coastal*, 675 F.2d at 1357); *see Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 245-46

(1944); *see also* 12 JAMES WM. MOORE ET AL., *Moore's Federal Practice* ¶ 60.21[4][a] (3d ed. 1999) (stating that fraud upon the court encompasses an attempt to corrupt the "integrity of the normal process of adjudication"). These "egregious cases" include "bribery of a judge or juror, or improper influence exerted on the court by an attorney, in which the integrity of the court and its ability to function impartially is directly impinged." *Great Coastal Exp., Inc*, 675 F.2d at 1356.

Notably, fraud on the court "presents . . . a very high bar for any litigant." *Fox*, 739 F.3d at 136-37. In particular, establishing fraud on the court involves "corruption of the judicial process itself" and does not apply to a "routine evidentiary conflict." *Id.* at 136 (internal quotations omitted). Although plaintiffs need not "prove" their case at the motion to dismiss stage, their allegations must be sufficient to state a claim.

Plaintiffs acknowledge that their allegations "may not be the best fit" for a claim of fraud on the court. ECF 19 at 20, Second Amended Brief. But, they posit that the allegations "certainly state a claim for relief in some fashion. This is especially apparent from the false representations of holder status made by Appellees in the Bankruptcy Case, and Wells Fargo's impossible 2013 Trust Assignment that was provided to Appellants at the court's direction." *Id.*

Judge Gordon rejected the contention that the conduct of Wells Fargo and US Bank constituted fraud upon the court. In his Memorandum Opinion of November 5, 2014, Judge Gordon explained: "At the core of the dismissal with prejudice of Count I is the Complaint's irremediable failure to explain with precision beyond rhetoric and hyperbole why Wells Fargo's holding itself out as a creditor by filing proofs of claim amounts to fraud." ECF 51 at 18 in Adv. Proc. No. 13-510. According to the Bankruptcy Court, "Wells Fargo's actions could only possibly be wrongful if it knew or should have known that it had no right to file the proofs of

claim, because some other, identifiable true holder of the Note and DOT [*i.e.*, Deed of Trust] was entitled to do so, yet filed the claims anyway in contravention of that holder's rights." *Id.* But, he added, "it is just as (and frankly more) plausible to conclude that Wells Fargo reasonably believed it had every right to enforce the Note and DOT, that the foreclosure fees were legitimate and recoverable and that Claims Nos. 4-1 and 4-2 were filed to achieve those simple ends." *Id.*

In addition, Judge Gordon found a second critical shortcoming, pertaining to plaintiffs' failure to allege any damage resulting from the purported misrepresentations. At the hearing on March 4, 2014, for example, he stated, Apx. 223 (emphasis added):

> Count one is fraud upon the Court, that the proof of claims were filed to defraud the Court by hiding the fact that the trust had terminated, and Wells Fargo was not entitled to recover fees from the foreclosure. This is spiced with a fleeting but basically unexplained mention of an AG, attorney general, settlement[42] and how that impacts upon Wells Fargo's claim filing duties generally, a "pattern and

---

[42] In the Complaint, the Howes referred to a settlement between Wells Fargo and "49 State Attorneys' General." Apx. 38, Complaint ¶ 67. The circumstances giving rise to this settlement, and its significance here, are unclear. "

According to the Complaint, Wells Fargo entered into a "Consent Order" pursuant to the AG Settlement. The Howes allege that the AG Consent Order stated, in pertinent part, Apx. 44, Complaint ¶ 95 (emphasis in Complaint):

> Servicer shall not file a [proof of claim] in a bankruptcy proceeding which, when filed, contained **materially inaccurate information**. In cases in which such a POC may have been filed, **Servicer shall not rely on such POC and shall** (a) in active cases, at Servicer's expense, take appropriate action, consistent with state and federal law and court procedure, to **substitute such POC with an amended POC as promptly as reasonably practicable (and, in any event, not more than 30 days) after acquiring actual knowledge of such material inaccuracy** and provide appropriate written notice to the borrower or borrower's counsel; and (b) in other cases, at Servicer's expense, take appropriate action after acquiring actual knowledge of such material inaccuracy.

Plaintiffs further assert, Apx. 38, Complaint ¶ 67: Wells Fargo sought to hide Trust termination by not attaching to the Amended Claim evidence of Trust termination, although required to do so by Fed. R. Bankr. P. 3001 and the settlement it reached with the 49 State Attorneys' General effective April 5, 2012 (hereinafter 'AG Settlement')."

practice" of Wells Fargo and US Bank of filing fraudulent proof of claims and a spiel at the end about how tough it is to get better and how easy it is to be a bank.

All of that may be true, but how does it set out a claim for fraud upon the Court in this case?  *Absolutely no detailed allegation of how misfiling of the proof of claims caused an injury to the Debtor or the Court or allowed Wells Fargo or US Bank to gain an advantage.  And I mean a real advantage.*

In his Memorandum Opinion of November 5, 2014, Judge Gordon concluded:  "There is nothing alleged in the Complaint that plausibly supports the notion that Wells Fargo set in motion an unconscionable scheme calculated to interfere with this Court's process by filing Claim Nos. 4-1 and 4-2. Without a legitimate, non-frivolous allegation that Wells Fargo knowingly acted in contravention of some other entity's right to enforce the Note and DOT, a claim of 'fraud on the court' cannot be alleged in good faith."  ECF 51 at 21 in Adv. Proc. No. 13-510.

In my view, the Bankruptcy Court did not err in its dismissal of Count I, because the Complaint does not adequately allege fraud upon the court.  It does not allege a scheme to subvert the legal process or to thwart the ability of a court to function impartially.  Even assuming, *arguendo*, that Wells Fargo and US Bank should have disclosed the termination of the Trust, the omission does not constitute fraud upon the court, because the Note remains enforceable.  Moreover, plaintiffs failed to identify a material adverse consequence resulting from the alleged misrepresentations.[43]

---

[43] To be sure, a lawyer who knowingly files a false document with a court may face serious professional consequences.  *See, e.g.*, *Attorney Grievance Comm'n of Maryland v. Geesing*, 436 Md. 56, 80 A.3d 718 (2013) (suspension for filing robo-signed affidavits in foreclosure proceedings); *Attorney Grievance Comm'n of Maryland v. Dore*, 433 Md. 685, 73 A.3d 161 (2013) (same); *see also* Maryland Lawyers' Rules of Professional Conduct 3.3(a)(1) (making or failing to correct a false statement to a tribunal); 8.4(c) (dishonesty, fraud, misrepresentation); 8.4(d) (conduct prejudicial to the administration of justice).  But, such conduct does not necessarily constitute fraud upon the court.

In the alternative, plaintiffs argued that the misconduct of Wells Fargo and US Bank in concealing the termination of the Trust amounted to common law fraud.  Apx. 358, Hearing dated July 16, 2014.   At the hearing on July 16, 2014, they asserted: "The main fraud [perpetrated by Wells Fargo] is trying to hide the fact that there was no standing to file the foreclosure case."  Apx. 342, Hearing of January 6, 2014.  Moreover, the Howes maintain that the filing of their bankruptcy case and the related litigation that ensued constituted justifiable reliance and damages.  They posit: "Appellants suffered damages as a result of the concealment by having to file the Bankruptcy Case to stop the foreclosure sale, incurred legal fees to uncover and stop Wells Fargo and US Bank from benefitting from their concealment, and they suffered damages from the delay this litigation has caused in getting their bankruptcy reorganization approved."  ECF 19 at 18, Second Amended Brief.

Under Maryland law, "'[f]raud encompasses, among other things, theories of fraudulent misrepresentation, fraudulent concealment, and fraudulent inducement.'"  *Sass v. Andrew*, 152 Md. App. 406, 432, 832 A.2d 247, 261 (2003) (citation omitted). Regardless of the particular theory, at a trial the plaintiff must establish the elements of fraud "by clear and convincing evidence" *Md. Envir. Trust v. Gaynor*, 370 Md. 89, 97, 803 A.2d 512, 517 (2002).  In an action for fraudulent misrepresentation, the plaintiff ordinarily must show:

> (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Nails v. S & R, Inc.*, 334 Md. 398, 415, 639 A.2d 660, 668 (1994); *accord Thomas v. Nadel*, 427 Md. 441, 451 n.18, 48 A.3d 276, 282 n.18 (2012); *Sass*, 152 Md. App. at 429, 832 A.2d at 260.

"A 'false representation' is a statement, conduct, or action that intentionally

misrepresents a material fact." *Sass*, 152 Md. App. at 430, 832 A.2d at 260 (citation omitted); *see also Gross v. Sussex Inc.*, 332 Md. 247, 258, 630 A.2d 1156, 1161 (1993) (stating that, to be actionable, a false representation "must be of a material fact").   "A 'material' fact is one on which a reasonable person would rely in making a decision," *Sass*, 152 Md. App. at 430, 832 A.2d at 260, or a fact that "'the maker of the misrepresentation knows . . . [the] recipient is likely to regard . . . as important . . . .'"  *Gross*, 332 Md. at 258, 630 A.2d at 1161 (citation omitted). Moreover, the fraudulent "misrepresentation must be made with the deliberate intent to deceive." *Sass*, 152 Md. App. at 430, 832 A.2d at 260 (citing *VF Corp. v. Wrexham Aviation Corp.*, 350 Md. 693, 704, 715 A.2d 188 (1998)); *accord Rhee v. Highland Dev. Corp.*, 182 Md. App. 516, 524, 958 A.2d 385, 390 (2008). So, the defendant must "know[ ] that his representation is false" or be "recklessly indifferent in the sense that he knows that he lacks knowledge as to its truth or falsity." *Ellerin v. Fairfax Savings, F.S.B.*, 337 Md. 216, 232, 652 A.2d 1117, 1125 (1995).

Ordinarily, under Maryland law, a mere failure to disclose a material fact does not constitute fraud, in the absence of a legal duty to disclose that inheres in certain types of transactions. In other words, a claim of failure to disclose "requires only that the defendant remain silent about, or omit, facts that the defendant had a duty to disclose." *Lloyd v. Gen'l Motors Corp.*, 397 Md. 108, 138 n.11, 916 A.2d 257, 274 n.11 (2007).  "Maryland recognizes no general duty upon a party to a transaction to disclose facts to the other party."  *Gaynor*, 370 Md. at 97, 803 A.2d at 516.   However, "[e]ven in the absence of a duty of disclosure, one who suppresses or conceals facts which materially qualify representations made to another may be guilty of fraud."  *Finch v. Hughes Aircraft Co.*, 57 Md. App. 190, 239, 469 A.2d 867, 891 *cert. denied*, 300 Md. 88, 475 A.2d 1200 (1984), *cert. denied*, 469 U.S. 1215 (1985).

Fraud based on active suppression of material facts is the variety of fraud referred to as

"fraudulent concealment."  The Maryland Court of Appeals has said: "Fraudulent Concealment

'is any statement or other conduct which prevents another from acquiring knowledge of a fact,

such as diverting the attention of a prospective buyer from a defect which otherwise, he would

have observed.'" *Lloyd*, 397 Md. at 138, 916 A.2d at 274 (citation omitted). It describes a

"situation where the defendant actively undertakes conduct or utters statements designed to, or

that would, divert attention away from" a material fact. *Id.* at 138 n.11, 916 A.2d at 274 n.11.

"To create a cause of action, concealment must have been intentional and effective-the

hiding of a material fact with the attained object of creating or continuing a false impression as to

that fact. The affirmative suppression of the truth must have been with intent to deceive." *Fegeas*

*v. Sherrill*, 218 Md. 472, 476–77, 147 A.2d 223, 225–26 (1958). As the *Rhee* Court explained,

182 Md. App. at 536, 958 A.2d at 396 (quoting *Stewart v. Wyoming Cattle–Ranche Co.,* 128

U.S. 383 (1888)) (alterations in *Rhee*):

> [T]he concealment or suppression [of a material fact] is in effect a representation
> that what is disclosed is the whole truth. The gist of the action [for fraud] is
> fraudulently producing a false impression upon the mind of the other party; and if
> this result is accomplished, it is unimportant whether the means of accomplishing
> it are words or acts of the defendant . . . .

Where the fraudulent concealment claim is based on a duty to disclose, Maryland has

formulated the elements of the cause of action as follows, *Blondell v. Littlepage,* 413 Md. 96,

119, 991 A.2d 80, 94 (2010) (quoting *Lloyd,* 397 Md. at 138, 916 A.2d at 274) (emphasis

omitted):

> (1) [T]he defendant owed a duty to the plaintiff to disclose a material fact; (2) the
> defendant failed to disclose that fact; (3) the defendant intended to defraud or
> deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the
> concealment; and (5) the plaintiff suffered damages as a result of the defendant's
> concealment.

*See also Green v. H & R Block*, 355 Md. 488, 525, 735 A.2d 1039, 1059 (1999).

60

The Maryland Court of Appeals encapsulated the foregoing principles in *Frederick Road Ltd. Partnership v. Brown & Sturm*, 360 Md. 76, 100 n.14, 756 A.2d 963, 976 n.14 (2000) (internal citations omitted):

> Ordinarily, non-disclosure does not constitute fraud unless there exists a duty of disclosure. Absent a fiduciary relationship, this Court has held that a plaintiff seeking to establish fraudulent concealment must prove that the defendant took affirmative action to conceal the cause of action and that the plaintiff could not have discovered the cause of action despite the exercise of reasonable diligence, and that, in such cases, the affirmative act on the part of the defendant must be more than mere silence; there must be some act intended to exclude suspicion and prevent injury, or there must be a duty on the part of the defendant to disclose such facts, if known.

In my view, the allegation of common law fraud suffers from critical defects, and therefore dismissal was proper.  Although plaintiffs contend that Wells Fargo and US Bank committed fraud by the knowing filing of false documents in an effort to collect on the Note, plaintiffs rely on mere conclusory assumptions that Wells Fargo and US Bank knew the Note was unenforceable once the Trust was terminated.  Apart from the absence of a factual basis for the assertion, it is also noteworthy that, under *Jaimes* and *Brock*, the Note can remain enforceable, notwithstanding the termination of the Trust.  In addition, plaintiffs failed to allege facts showing that they reasonably relied on the alleged misrepresentation or suffered any injury as a result of the misrepresentation.

In any event, assuming the attempted foreclosure sale constitutes damages, this argument is unpersuasive.  The Howes do not dispute that they signed the Note.  They also do not suggest that their execution of the Note was induced by fraud.  Moreover, they offer no facts to suggest that they paid the entirety of the debt.  Nor do they deny that they were in default, which is what led to the foreclosure proceedings.  Indeed, the Howes fell into default on their mortgage in April 2009, well before the alleged misrepresentations in the State foreclosure cases or in the Chapter

13 case, and for the most part failed ot make payments for almost four years.   Apx. 26, Complaint ¶ 17.   The facts offered in the Complaint do not suggest a different narrative.

In the alternative, plaintiffs challenge dismissal of Count I on the ground that the Bankruptcy Court improperly "look[ed] beyond the four corners of the Complaint" and relied on documents extrinsic to the Complaint.   ECF 19 at 7, Second Amended Brief.   This contention is also without merit.   At the hearing on the motions to reconsider, Judge Gordon explained that the claim for fraud failed on its face.   Moreover, the record do not suggest that, in dismissing Count I, Judge Gordon considered documents that were not appended to the Complaint or integral to it.

I turn next to plaintiffs' contention that the Bankruptcy Court should have granted leave to amend Count I.   ECF 19 at 7, Second Amended Brief.   The Bankruptcy Court dismissed Count I, without leave to amend, because it found that "amendment would be futile."   ECF 51 at 24 in Adv. Proc. No. 13-510, Memorandum Opinion of November 5, 2014.   But, Judge Gordon allowed the Howes to assert a challenge to Christiana's right to enforce the Note if Christiana submitted documentation supporting its claim of ownership of the Note.   Apx. 366.   He also permitted the Howes to file an amended complaint or a claim objection in order to make such an argument.   *Id.*

Pursuant to Fed. R. Bankr. P. 7015, Fed. R. Civ. P. 15(a)(2) applies to adversary proceedings in a bankruptcy case.   Under Fed. R. Civ. P. 15(a)(2), "[t]he court should freely give leave [to amend] when justice so requires."   *See Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 118 (4th Cir. 2013), *cert. denied*, ____ U.S. ____, 134 S. Ct. 2871 (2014); *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 769 (4th Cir. 2011).   "Rule 15(a) grants the district court broad discretion concerning motions to amend pleadings, and leave should be granted absent some reason 'such as undue delay, bad faith or dilatory motive on the part of the

movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment or futility of the amendment.'" *Booth v. Maryland,* 337 F. App'x 301, 312 (4th Cir. 2009) (per curiam) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)); *see also Equal Rights Center v. Niles Bolton Associates*, 602 F.3d 597, 603 (4th Cir. 2010); *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (en banc).

The confusion as to the identity of the holder of the Note led to defective and/or inaccurate submissions during the State foreclosure proceedings and in the bankruptcy case. Nonetheless, there are no facts alleged to show a miscarriage of justice or detrimental reliance resulting from any alleged misrepresentations.   Nor are there any facts alleged to show that defendants acted with the intention of deceiving the court or the parties.   Moreover, as indicated, termination of the Trust does not foreclose enforcement of the Note.   And, under Maryland's Commercial Law Article, discussed *infra*, enforcement of a note is not foreclosed merely because the party seeking enforcement lacks actual possession of the instrument.   As such, it cannot be fairly said that defendants committed fraud by attempting to enforce the Note.   For these reasons, any amendment by plaintiffs would be futile.   It follows that the Bankruptcy Court did not err in failing to grant leave to amend Count I.

Turning to the Complaint's remaining counts, as indicated, many of them relate to the Trust's termination and the same purported misrepresentations at issue in Count I.   As noted, in Judge Gordon's view, dismissal of the remaining counts was warranted because they were based on the same facts as in Count I and "had to be cleansed of the detritus of the bogus fraud allegations."   ECF 51 at 24, n.26,   in Adv. Proc. No. 13-510, Memorandum Opinion of November 5, 2014.

### C.      Count II -- Determination of Scope, Extent, and Validity of Lien

In Count II, plaintiffs sought a "Determination of Scope, Extent and Validity of Lien," pursuant to 11 U.S.C. §§ 105 and 506.  Apx. 41, Complaint at 20.  In pertinent part, § 506(d) provides:  "To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void . . . ."

The Howes asserted in Count II that the Note and Allonge contained "endorsements" that, "if bona fide," resulted "in the Note being payable to the order of US Bank as trustee for the Trust."  Apx. 41, Complaint ¶ 75.  Because the Trust ceased to exist in January 2012, plaintiffs alleged that US Bank had no right to enforce the Note.  *Id.* ¶ 76.  Further, plaintiffs alleged that "Wells Fargo is not a holder of the Note," *id.* ¶ 79, and did not possess it when it filed the Amended Claim.  *Id.* ¶ 80.  According to plaintiffs, the Note is "'order paper'" under C.L. § 3-201(b), and "negotiation requires transfer of possession of the instrument and its indorsement by the holder."  *Id.*¶ 77.  Further, Carrington "acquired no interest in the Note or Amended Claim" because Wells Fargo had no "standing to file the Amended Claim. . . ."  Apx. 42, Complaint ¶ 83.  Indeed, none of the defendants had the right to enforce the Note or the Deed of Trust, according to plaintiffs.  *Id.* ¶ 85.

Plaintiffs requested a ruling, *inter alia*, that "none of the Defendants has the right to enforce the Note and Deed of Trust lien under applicable state law," and "none of the Defendants has an enforceable secured or unsecured claim against property of the estate in the Bankruptcy Case." Apx. 42, Complaint ¶ 85A.-B.

In my view, plaintiffs conflate the significance of the Trust's termination and the enforceability of the Note with questions as to which party has the right to pursue enforcement of the Note.

Under Maryland law, the right to enforce a promissory note and other negotiable instruments is governed by Maryland's Commercial Law Article. *See Deutsche Bank Nat. Trust Co. v. Brock*, *supra*, 430 Md. at 728, 63 A.3d at 48; *Shepherd v. Burson*, 427 Md. 541, 550, 50 A.3d 567, 573 (2012); *Anderson v. Burson*, 424 Md. 232, 245, 35 A.3d 452, 460 (2011). "Whether a negotiable instrument, such as a deed of trust note, is transferred or negotiated dictates the enforcement rights of the note transferee." *Anderson*, 424 Md. at 246, 35 A. 3d at 461. Once a note is transferred, "the right to enforce the deed of trust follow[s]." *Syrcek v. Rosenberg,* 203 Md. App. 705, 727, 40 A.3d 494, 507 (2012).

Maryland Code (2013 Repl. Vol., 2014 Supp.), C.L. § 3-301 outlines three categories of persons "entitled to enforce [an] instrument":

> (i) the holder of the instrument, (ii) a nonholder in possession of the instrument who has the rights of a holder [*i.e.*, a transferee], or (iii) a person not in possession of the instrument who is entitled to enforce the instrument pursuant to § 3-309 or § 3-418 (d). A person may be a person entitled to enforce the instrument even though the person is not the owner of the instrument or is in wrongful possession of the instrument.

The first class of persons entitled to enforce an instrument under C.L. § 3-301(i) is a "holder of the instrument." *Id.* "Holder" is defined, *inter alia*, as "[t]he person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession[.]" Md. Code (2013 Repl. Vol., 2014 Supp.), C.L. § 1-201(b)(21)(i).[44] A promise or order is payable to bearer if it 1) states that it is payable to bearer or otherwise indicates that the individual or entity in possession of the promise or order is entitled to payment; (2) does not specify a payee; or (3) indicates that it is payable to cash or otherwise indicates that

---

[44] At the time of the First Foreclosure Case and the Second Foreclosure Case, this provision was found in Md. Code (2002), C.L. § 1-201(b)(20)(a), with minor differences in the text that are not material here.

it is not payable to an identified person.  C.L. § 3-109(a)(1)-(3).  Accordingly, "the person in possession of a note, either specially indorsed to that person or indorsed in blank,[ ] is a holder entitled generally to enforce that note."[45]  *Brock*, 430 Md. at 729-30, 63 A.3d at 49.

The second class of persons "entitled to enforce an instrument" is a "nonholder" of the note who is "in possession of the instrument" and "has the rights of a holder . . . ."  C.L. § 3-301(ii).  A person becomes a nonholder in possession through a "transfer" of the instrument. *Compare* C.L. § 3-203(a) (defining transfer of an instrument) *with* C.L. § 3-201(a) (defining negotiation of an instrument).  *See also Anderson*, 424 Md. at 246-47, 35 A.3d at 461.  "A transfer has two requirements: the transferor (any person [who] transfers the note, except the issuer) must intend to vest in the transferee the right to enforce the instrument (thieves and accidental transferees are excluded) and must deliver the instrument so the transferee receives actual or constructive possession."  *Id.* at 246, 35 A.3d at 461; *see* C.L. § 3-203.  "A transfer vests in the transferee only the rights enjoyed by the transferor, which may include the right to enforce the instrument. C.L. § 3-203(a)-(b).[ ]"  *Anderson*, 424 Md. at 246, 35 A.3d at 461.  In addition, a transferee obtains "the rights that his transferor obtained from his own transferor."  *Id.* at 248, 35 A.3d at 462.  Stated another way, "[a] transferee's rights . . . can be no greater than his or her transferor's because those rights are 'purely derivative.'"  *Id.* at 249, 35 A.3d at 462 (citation omitted).[46]  As a result, if a holder transfers the note—for example, through a bulk sale of notes without the individual indorsement of each note—the transferee obtains from the holder the right to enforce the note even if no negotiation takes place.  In such a circumstance, the

---

[45] "When indorsed in blank, an instrument becomes payable to bearer and may be negotiated by transfer of possession alone until specially indorsed."  C.L. §3-205(b).

[46] The *Anderson* Court also discussed how a nonholder in possession may enforce a note. *See* 424 Md. at 248-49, 35 A.3d at 462.

transferee does not become an Article 3 "holder." *See* C.L. § 3-203 cmt. 1-2.

A negotiation, whether voluntary or involuntary, occurs when an instrument is transferred to one who becomes a holder.  C.L. § 3-201(a).  A negotiation of an instrument payable to an identified person, however, requires the holder to transfer possession *and indorse the instrument*."  *Anderson*, 424 Md. at 246-47, 35 A.3d at 461 (emphasis added); *see* C.L. § 3-201(b).[47]  Notably, "only a holder may negotiate an instrument.  C.L. § 3-203 cmt. 1.  Thus, a recipient of a transferred instrument is a transferee, but a recipient of a negotiated instrument is a holder."  *Anderson,* 424 Md. at 247, 35 A.3d at 461.

If the person seeking to enforce the note is neither a holder nor a nonholder in possession of the instrument, with the rights of a holder (*i.e.,* a transferee), C.L. § 3-301(iii) provides a third class of persons who may have a basis to enforce the instrument, pursuant to C.L. § 3-309 or § 3-418(d).  Of relevance here, C.L. § 3-309 provides, in part:

> (a) A person not in possession of an instrument is entitled to enforce the instrument if (i) the person was in possession of the instrument and entitled to enforce it when loss of possession occurred, (ii) the loss of possession was not the result of a transfer by the person or a lawful seizure, and (iii) the person cannot reasonably obtain possession of the instrument because the instrument was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process.

> (b) A person seeking enforcement of an instrument under subsection (a) must prove the terms of the instrument and the person's right to enforce the instrument. If that proof is made, § 3-308 applies to the case as if the person seeking enforcement had produced the instrument. . . .[48]

---

[47] Under C.L. § 3-201(b), when "an instrument is payable to an identified person, negotiation requires transfer of possession of the instrument and its indorsement by the holder.  If an instrument is payable to bearer, it may be negotiated by transfer of possession alone."

[48] Potential methods of proof are set forth in C.L. § 3-308:

> (a) In an action with respect to an instrument, the authenticity of, and authority to make, each signature on the instrument is admitted unless specifically

In sum, under C.L. § 3-301(iii) and § 3-309(a), if the note is lost, a party may still seek to enforce the instrument.   However, under C.L. § 3-309(b), the person seeking to enforce the instrument "must prove the terms of the instrument and the person's right to enforce the instrument." In other words, the nonholder who lacks possession of the note bears the burden of proving the right to enforce it.    C.L. § 3-309(b).   And, a lack of competing interests in the instrument does not establish that a person is entitled to enforce it.

As to burden of proof and enforcement of negotiable instruments in Maryland, *Anderson v. Burson*, *supra*, 424 Md. 232, 35 A.3d 452, is instructive.   In that case, the Andersons refinanced their home mortgage in 2006.  *Id.* at 235, 35 A.3d at 454.  In doing so, Mr. Anderson executed a promissory note ("Anderson Note") in favor of Wilmington Finance, Inc. ("Wilmington") and both Mr. and Ms. Anderson signed the deed of trust, pledging their home as security for the note.  *Id.* at 236, 35 A.3d at 454.  Mr. Anderson defaulted on the Anderson Note in 2007.  *Id.* at 236, 35 A.3d at 455.   In 2008, substitute trustees, as agents of the trustee Deutsche Bank Trust Company Americas ("Deutsche"), commenced foreclosure proceedings

---

denied in the pleadings. If the validity of a signature is denied in the pleadings, the burden of establishing validity is on the person claiming validity, but the signature is presumed to be authentic and authorized unless the action is to enforce the liability of the purported signer and the signer is dead or incompetent at the time of trial of the issue of validity of the signature. If an action to enforce the instrument is brought against a person as the undisclosed principal of a person who signed the instrument as a party to the instrument, the plaintiff has the burden of establishing that the defendant is liable on the instrument as a represented person under § 3-402(a).

(b) If the validity of signatures is admitted or proved and there is compliance with subsection (a), a plaintiff producing the instrument is entitled to payment if the plaintiff proves entitlement to enforce the instrument under § 3-301, unless the defendant proves a defense or claim in recoupment. If a defense or claim in recoupment is proved, the right to payment of the plaintiff is subject to the defense or claim, except to the extent the plaintiff proves that the plaintiff has rights of a holder in due course which are not subject to the defense or claim.

against the Andersons in the Circuit Court for Howard County.  *Id.* at 236, 35 A.3d at 455.  At the time of the foreclosure, Deutsche was the purported holder of the Note.  As to Deutsche's rights to enforce the Anderson Note, the substitute trustees filed a motion for acceptance of a lost note affidavit, which the circuit court granted.  *Id.*

To prevent a foreclosure sale, the Andersons sought an injunction to preclude enforcement of the Anderson Note, challenging the right of the substitute trustees to enforce the Anderson Note on behalf of Deutsche.  *Id.* at 239, 35 A.3d at 456.[49]   The circuit court enjoined the foreclosure proceeding until a hearing could be held regarding the requested injunction.  *Id.*

The Anderson Note, initially held by Wilmington, had been transferred three times and securitized.  *Id.*  First, the initial lender, Wilmington, transferred the Anderson Note to Morgan Stanley Mortgage Capital Holding, Inc. ("Morgan Stanley I"), which in turn transferred the Anderson Note to Morgan Stanley ABS Capital I Inc. ("Morgan Stanley II").  *Id.*  Morgan Stanley II then securitized the Anderson Note, along with several other notes, into the Morgan Stanley Home Equity Loan Trust 2007-2 ("Morgan Stanley Trust"), for which Deutsche was named as the trustee, pursuant to a pooling and servicing agreement.  *Id.*  The Anderson Note was not indorsed to reflect these transfers, however.  *Id.*

The circuit court held three evidentiary hearings to ascertain if the substitute trustees were entitled to enforce the Anderson Note on behalf of Deutsche.  *Id.*  At the first hearing, the substitute trustees produced a photocopy of the unindorsed note and claimed that the original note was indorsed in blank.  *Id.* at 239, 35 A.3d at 456-57.  This contradicted prior representations that the Anderson Note was lost.  Given the "curious turn of events," the circuit

---

[49] The Andersons also initiated a Chapter 13 proceeding in Bankruptcy Court, which "caused a temporary halt in the foreclosure action. . . ."  *Anderson*, 424 Md. at 237, 35 A.3d at 455.  In federal court, the Andersons "acknowledged the mortgage debt. . . ."  *Id.*

court rescheduled the evidentiary hearing to determine the substitute trustees' right to enforce the Anderson Note. *Id.* at 239, 35 A.3d at 457.

At the second hearing, the substitute trustees produced the Anderson Note, but it was not indorsed. *Id.* They asserted: "'We have the original Note, but we do not have an indorsement; we do not have an assignment; *we do not have an allonge . . . .*'" *Id.* at 239-40, 35 A.3d at 457 (emphasis in *Anderson*). Because the substitute trustees failed to comply with the Andersons' discovery request for a copy of the pooling and service agreement, the court continued the evidentiary hearing. *Id.* at 240, 35 A.3d at 457.

At the third evidentiary hearing, the substitute trustees produced, *inter alia*, "an undated, unattached allonge [to the Anderson Note], signed by Wilmington purported[ly] transferring the [Anderson] Note to Deutsche," as trustee for the Morgan Stanley Trust. *Id.* at 240, 35 A.3d at 457. Notably, the allonge "did not contain indorsements from the parties that possessed intermediately the Note." *Id.* In particular, the allonge did not evidence the transfers from Wilmington to Morgan Stanley I; from Morgan Stanley I to Morgan Stanley II; or from Morgan Stanley II to the Morgan Stanley Trust, for which Deutsche served as trustee through a pooling and service agreement.

The Andersons claimed that Wilmington "lacked the capacity to indorse the Note to Deutsche, via the allonge," *id.* at 241, 35 A.3d at 457, because Wilmington had already transferred its interest in the Anderson Note to Morgan Stanley I. *Id.* Thus, in the Andesons' view, Wilmington "had no interest left to convey to Deutsche at that time." *Id.*

Despite the missing indorsements, the circuit court ruled in favor of Deutsche and the substitute trustees acting on its behalf. *Id.* at 241, 35 A.3d at 457-58. It found that Wilmington "indorsed successfully" the Anderson Note to Deutsche through the allonge, "despite

acknowledging indorsement gaps in the Note's overall transfer history." *Id.* at 241, 35 A.3d at 457-58. "Thus, the trial judge determined that the Substitute Trustees were holders of the Note under [C.L.] § 3–302(a),[] and denied the Andersons' demand for an injunction." *Id.* at 241, 35 A.3d at 458.

*Anderson* presents a scenario in which initially the substitute trustees who sought to enforce the Anderson Note claimed the negotiable instrument was lost and filed a lost note affidavit. But, at the final evidentiary hearing, the substitute trustees produced a copy of the instrument in question. Nevertheless, on the subject of lost instruments generally, the Maryland Court of Appeals noted: "Mortgage transferors frequently lose or misplace mortgage documents . . . ." *Id.* at 238, 35 A.3d at 456. The court also pointed to the frequent use of lost note affidavits.

Given that the Anderson Note was eventually produced, the Maryland Court of Appeals considered whether the substitute trustees, as agents for Deutsche, were "nonholders in possession of the instrument and have the rights of holders." *Id.* at 242, 35 A.3d at 458. It concluded that Deutsche was "not a holder of the Anderson Note," because the note was payable to Wilmington, and Wilmington "did not indorse the [Anderson] [N]ote itself." *Id.* at 247, 35 A.3d at 461-62. The court also agreed with the Andersons that the allonge purportedly transferring the note from Wilmington to Deutsche was "anachronistically impossible." *Id.* at 247, 35 A.3d at 462. It explained: "Deutsche's role as trustee did not arise until after Wilmington had transferred its rights to Morgan Stanley I; thus, by the time Wilmington reputedly made the allonge to Deutsche, Wilmington had no rights in the Note to transfer. Therefore, Wilmington did not negotiate the Note to Deutsche." *Id.* at 247-48, 35 A.3d at 462.

Notwithstanding Deutsche's status as a nonholder, the Maryland Court of Appeals determined that because the Andersons "conceded the transfer history of the Note, the Substitute

Trustees may enforce [it] as nonholders in possession," as agents for Deutsche, with the rights of a holder. *Id.* at 243, 35 A.3d at 458-59; *see also id.* at 252, 35 A.3d at 464 ("On the record here, the Substitute Trustees may enforce the Anderson Note as nonholders in possession who have the rights of holders.").   The court also recognized that under Maryland law "a reputed transferee in possession of an unindorsed mortgage note has the burden to establish its rights under the note . . . ." *Id.* at 245, 35 A.3d at 460.   The court explained, *id.*:

> We agree that, when put at issue properly (as was the case here), a reputed transferee in possession of an unindorsed mortgage note has the burden to establish its rights under that note—especially in instances where the mortgagor requests an injunction to foreclose enforcement by the possessor based on such a defense. Maryland Rule 14–207(b)(3)[ ] requires a mortgagee to produce a copy of the note.   Thereafter, the Maryland Commercial Law Article takes over and . . . requires a person in possession of an unindorsed mortgage note to prove that note's prior transfer history (as opposed to a holder, whom the Commercial Code presumes is entitled to payment under § 3-308(a)).[ ]

The court added:   "[G]iven the chain-of-possession document quagmire exemplified by this case, fairness dictates that the mortgagee produce the necessary proof, when that matter is put at issue properly." *Id.* at 245-46, 35 A.3d at 460.

The significance of the *Anderson* case is at least threefold.   First, it recognizes that, pursuant to C.L. § 3-301, a nonholder, *i.e.* a transferee of the instrument who is in possession of the instrument, may still be entitled to enforce it.   Second, the case acknowledges that there are methods to establish the right to enforce a note even without possession of the instrument, such as a lost note affidavit.   Third, it emphasizes that the burden is on the person or entity seeking to enforce the instrument to establish his/its interest, and the court is permitted to take evidence on this point.

With this framework in mind, I turn to plaintiffs' contentions.   They argue that, given the Trust's termination, "none of the Appellees has demonstrated a right to enforce the Howes' Note, and the bankruptcy court erred in holding otherwise and dismissing the Complaint."   ECF 18 at

11, Reply.  Plaintiffs also contend that the Bankruptcy Court erred by "putting the burden on Appellants to find a competing claimant, or pay the claimant . . . despite [the claimant's] failure to establish its right to enforce the note."  ECF 19 at 29, Second Amended Brief.  Stated differently, plaintiffs maintain that the Bankruptcy Court improperly ruled that one of the adversary defendants has a valid interest in the Note and, in so holding, alleviated the claimant of its burden to establish its standing to enforce the Note.  And, they assert that, under C.L. § 3-201, "the subject Note is order paper, and since it is payable to the Trust, and the Trust ceased to exist before the Second Foreclosure Case was filed, the plaintiffs in the Second Foreclosure case lacked the necessary standing to file it, and that case was a nullity."  *Id.*

Although not identical to *Anderson*, 424 Md. 232, 35 A.3d 452, a similar "chain-of-possession [ ] quagmire" presented itself in this case.  The adversary defendants may not be "in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession[.]"  C.L. § 1-201(b)(20)(a).  The Note itself may be lost. Nonetheless, under Maryland law these two factors are not dispositive of a party's rights under C.L. § 3-309(a).  Pursuant to C.L. § 3-309(b), however, the person or entity seeking to enforce the instrument "must prove the terms of the instrument and the person's right to enforce the instrument."

Plaintiffs misconstrue the Bankruptcy Court's ruling.  Notwithstanding Judge Gordon's view as to the termination of the Trust, the Bankruptcy Court did *not* rule that any of the adversary defendants has a definitive right to enforce the Note.  To the contrary, Judge Gordon explicitly stated that the question of who has the right to enforce the Note remains open, subject to proof and to challenge.  Indeed, he recognized that the Howes were entitled to know the identity of their creditor, and that the party seeking to enforce the Note bears the burden of

proving its right to do so.  Apx. 226-27, Hearing of March 4, 2014.  Therefore, the MTD Order of May 12, 2014, directed the defendant claiming the right to enforce the Note to submit evidence explaining the right to do so.  Apx. 285-287.  In addition, Judge Gordon permitted the Howes to file an amended complaint and/or a claim objection to dispute the right to enforce the Note.  Apx. 287, MTD Order.  Such a disposition comports with applicable Maryland law.

Thereafter, on April 3, 2015, Carrington, on behalf of Christiana, filed the Ostermann Affidavit, which confirmed that Christiana is the owner of the loan (Apx. 237),  and sent the Christiana Ownership Materials to plaintiffs. Apx. 236-37.  This, too, comports with Maryland's Commercial Law Article and *Anderson*.[50]

The Howes then had two avenues to challenge the claim of ownership of the Note or the claim of entitlement to enforce it.  First, the Bankruptcy Court granted the Howes leave to file an amended claim objection to the Amended Proof of Claim.  In the alternative, the Bankruptcy Court permitted the Howes to file an amended complaint.  Yet, the Howes elected not to challenge Christiana's interest in the Note via either method.

For the foregoing reasons, I conclude that the record does not support the Howes' contention that the Bankruptcy Court improperly ruled that an adversary defendant was entitled to enforce the Note without first having to establish its right to do so.

### D.    Count III -- Sanctions for Defective Proof of Claim

Count III alleged "Sanctions for Defective Proof of Claim" as to Wells Fargo and US Bank.   Apx. 43, Complaint at 22.  In general, plaintiffs insisted that both Wells Fargo and US

---

[50] As indicated, an Amended Transfer Notice was filed in the bankruptcy case, notifying Debtor that the Amended Claim was transferred from Wells Fargo to Christiana.  Apx. 37, Complaint ¶ 56.

Bank filed defective claims.  They asserted that defendants failed to comply with Fed. R. Bankr. P. 3001, and sought an order prohibiting U.S. Bank and Wells Fargo from presenting any evidence in support of their Amended Proof of Claim.  Apx. 45, Complaint ¶ 97.

US Bank and Wells Fargo filed proofs of claim in the bankruptcy case.  As indicated, on March 8, 2013, US Bank filed its initial Claim in the bankruptcy case, designated as "Claim No. 4."  Apx. 36, Complaint ¶¶ 53-54.  According to the Howes, the initial Claim was flawed because it failed to include an itemized statement of the interest, fees, and expenses incurred prepetition, an escrow account statement, and other necessary attachments.  Apx. 43, Complaint ¶ 89.  The Howes contend that the lack of supporting documentation translated "to no evidence of perfection" and no "breakdown of the claimed arrearage."  Apx. 36, Complaint ¶ 53.

On March 15, 2013, seven days after Wells Fargo filed its initial Claim, it filed an Amended Claim, designated "Claim 4-2," which identifies Wells Fargo as the creditor, instead of US Bank.  Apx. 36, Complaint ¶ 54.  Pursuant to Fed. R. Bankr. P. 3001(c)(2), Wells Fargo submitted with the Amended Claim a "Mortgage Proof of Claim Attachment," which itemized "the fees, expenses, and charges due on the claim," Apx. 36, Complaint ¶ 54; an "Escrow and Account Disclosure Statement" dated November 21, 2012, Apx. 403; the Deed of Trust, Apx. 385; and purportedly indorsed copies of the Note and Allonge.  Apx. 381-84.  With respect to the Amended Claim, the Howes insist it was defective because it "failed to attach [ ] a copy of the writing upon which it was based since the Note it attached is made payable to the order of the Trust, and the Trust terminated and ceased to exist in January 2012."  Apx. 43, Complaint ¶ 91.

Debtor filed a Claim Objection on April 2, 2013, "notif[ying] Wells Fargo that the Amended Claim is defective since it included no evidence of Wells Fargo's standing to file it."  Apx. 44-45, Complaint ¶ 92.  The Howes complained that Wells Fargo and US Bank did not

respond to their Claim Objection.  Apx. 44, Complaint ¶ 96.   As a remedy, the Howes sought to

enjoin Wells Fargo and US Bank from presenting evidence in the bankruptcy case.  Apx. 45,

Complaint ¶ 97.  They also requested attorney's fees.  *Id.*

Fed. R. Bankr. P. 3001 is titled "Proof of Claim."  Rule 3001(c)(2)(A) states:  "If, in

addition to its principal amount, a claim includes interest, fees, expenses, or other charges

incurred before the petition was filed, an itemized statement of the interest, fees, expenses, or

charges shall be filed with the proof of claim."  Fed. R. Bankr. P. 3001(c)(2)(D) provides that

"the court may" impose sanctions against a creditor who fails to attach the required

documentation and information required under Fed. R. Bankr. P 3001(c)(2).  Such "remedies"

are "permissive."  *In re Goeller*, No. 12-17123-RGM, 2013 WL 3064594, at *2 (Bankr. E.D. Va.

June 19, 2013).  Ultimately, however, "[a] bankruptcy court's decision to impose sanctions [ ] is

within its sound discretion and is, therefore, reversible only if that discretion has been abused."

*In re Nat'l Heritage Found., Inc.*, *supra*, 510 B.R. at 541.

Notwithstanding a failure to include all the information required under Rule 3001 in the

initial claim, a bankruptcy court "retains discretion to allow an amendment to a proof of claim

under appropriate circumstances . . . ."  Fed. R. Bankr. P. 3001 advisory comm. nn. (2011).

Moreover, a bankruptcy court may "determine[ ] that the failure was substantially justified or is

harmless . . . ."  Fed. R. Bankr. P. 3001 (b)(2)(D)(i).  In fashioning the appropriate remedy for a

violation of Rule 3001, "[f]actors such as culpability, harm and materiality should be

considered."  *In re Goeller*, *supra*, 2013 WL 3064594, at *2.

Dismissal of Count III was proper.  To the extent the Howes contend that the initial

Claim and the Amended Claim were fraudulent because US Bank and Wells Fargo failed to

disclose the Trust's termination (Apx. 43, Complaint ¶ 91), this argument is unavailing, for the

reasons already discussed.  And, although the initial Claim did not comport with Fed. R. Bankr. P. 3001, due to a failure to provide a breakdown of the claim arrearage, this error was corrected a mere seven days later, through the Amended Claim and the submission of the Mortgage Proof of Claim Attachment.  Apx. 37.  The Bankruptcy Court did not abuse its discretion by permitting the amendment or by denying plaintiffs' request for sanctions.

### E.      Count IV -- Unlawful Inspection of Fees

Count IV alleged "Unlawful Inspection of Fees."   The Howes contend that the Amended Claim submitted by Wells Fargo in the bankruptcy case includes unlawful inspection fees that contravene Md. Code (2013 Repl.), C.L. § 12–1027.   Apx. 46, Complaint ¶ 103; Apx. 374, Amended Claim.  According to the Howes, the purported fees are actually "disguised" inspection fees.   Apx. 36, Complaint ¶ 55.  In particular, they allege: "The Inspection Fees were for visual inspections of the Property, were not bona fide appraisals of the value of the Property, and were not needed to ascertain completion of construction of a new home or repairs, alterations, or other work required by Defendants."   Apx. 46, Complaint ¶ 104.   The Howes also sought a determination that U.S. Bank, Wells Fargo, and their successors could not collect any interest, costs, fees, or other charges with respect to the Note.  Apx. 46, Complaint ¶ 106.

It is not apparent from the record or the Bankruptcy Court's Memorandum Opinion why the court granted defendants' motions to dismiss as to Count IV.  Unlike most of the claims in the Complaint, this claim does not rely upon the termination of the Trust.  Nonetheless, upon a *de novo* review, dismissal of this claim was proper because plaintiffs failed to state a claim under Fed. R. Civ. P. 8.

The fees in issue are listed on the Mortgage Proof of Claim Attachment, submitted with the Amended Claim. Apx. 378.    Of particular relevance, the attachment includes a "Statement

of Prepetition Fees, Expenses, and Charges," which "[i]temize[s] the fees, expenses, and charges due on the claim . . . ." *Id.* Next to "Property inspection fees," the amount listed is "$0.00." *Id.* But, next to "Appraisal/broker's price opinion fees," the following dates and amounts were listed: "9/16/10: $50.00, 5/27/11: $90.00, 11/29/11: $90.00, 6/13/12: $90.00." *Id.* These fees amount to $320.00, as indicated on the form. *Id.*

The Howes posit: "The Inspection Fees are violations of CL § 12-1027 and may not be imposed. Any credit grantor who violates § 12-1027 may collect only the principal amount of the Note and may not collect any interest, costs, fees, or other charges with respect to the Note. In addition, a credit grantor who knowingly violates § 12-1027 shall forfeit to Plaintiffs 3 times the amount of interest, fees, and charges collected in excess of that authorized by this subtitle." Apx. 46, Complaint ¶ 105.

Md. Code (2013 Repl. Vol., 2014 Supp.), C.L. § 12-1027 provides (italics in C.L. § 12-1027):

> (a) "*Lender's inspection fee*" defined. -- In this section, "lender's inspection fee" means a fee imposed by a credit grantor to pay for a visual inspection of residential real property.
>
> (b) Except as provided in subsection (c) of this section, a credit grantor may not impose a lender's inspection fee in connection with a loan made to a consumer borrower that is secured by residential real property.
>
> (c) A lender's inspection fee may be imposed on a consumer borrower if the inspection is needed to ascertain completion of:
>
> > (1) Construction of a new home; or
> >
> > (2) Repairs, alterations, or other work required by the credit grantor.
>
> (d) This section does not apply to an appraisal of the value of real property by a credit grantor or to fees imposed in connection with an appraisal.

To be sure, C.L. § 12–1027(a) refers to an inspection fee, not an appraisal fee. The

statute prohibits the collection of "inspection fees" for the "visual inspection of residential real

property."  But, it expressly does not apply to "appraisal of the value of real property by a credit

grantor or to fees imposed in connection with an appraisal."  C.L. § 12-1027(d).

Carrington and Christiana maintained that the contested fees were appraisal costs and not

inspection fees.  They explained, Apx. at 169, Carrington MTD:

> The Proof of Claim originally filed by Wells Fargo does not contain any property
> inspection fees. In fact, the Proof of Claim explicitly labels the fees that the
> plaintiffs contend are "property inspection fees" as "Appraisal/broker's price
> opinion fees." The plaintiffs provide no evidence at all that these fees are
> "property inspection fees" or anything other than "Appraisal/broker's price
> opinion" fees. Since plaintiffs provide no factual support for the conclusory
> allegation that these fees are anything other than "Appraisal/broker's price
> opinion fees," Count four fails to "raise a right to relief above the speculative
> level." *Bell Atlantic v. Twombly*, 550 U.S. 554, 127 S. Ct. 1955, 1974 (2007).
> Therefore, Count Four must be dismissed.

Wells Fargo and US Bank lodged a similar challenge to Count IV.  They asserted, Apx.

90, Wells Fargo MTD:  "In a conclusory allegation, [the Howes] contend that these Inspection

Fees 'were not bona fide appraisals of the value of the Property, and were not needed to ascertain

completion of construction of a new home or repairs, alterations, or other work required by

Defendants.' Complaint, ¶ 104. This, however, is but an opinion without any factual basis."

According to Wells Fargo and US Bank, the claim is nothing more than "a case of clever

pleading."  Apx. 336, Hearing of January 6, 2014.

As noted, under Fed. R. Bankr. P. 8, Fed. R. Civ. P. 8 applies here.  To satisfy Rule

8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the

pleader is entitled to relief."  *See Twombly*, 550 U.S. at 555.  Although federal pleading rules "do

not countenance dismissal of a complaint for imperfect statement of the legal theory supporting

the claim asserted," *Johnson v. City of Shelby, Miss.*, *supra*, 135 S. Ct. at 346, the rule demands

more than bald accusations or mere speculation.  *Twombly*, 550 U.S. at 555; *see Iqbal*, *supra*,

566 U.S. at 684; *Painter's Mill Grille, LLC*, *supra*, 716 F.3d at 350.  Here, aside from naked allegations, plaintiffs did not provide any facts to support the notion that the contested fees listed on the "Statement of Prepetition Fees, Expenses, and Charges" as appraisal fees were actually inspection fees precluded by C.L. § 12-1027.  Therefore, the court properly dismissed Count IV, with leave to amend.

### F.  Count V – Truth In Lending Act

Count V alleged violations of TILA by Wells Fargo, US Bank, Unknown Defendant, and Christiana.[51]  Apx. 47, Complaint at 26.  Plaintiffs allege that when the Note and Deed of Trust were successively assigned to Wells Fargo, US Bank, and Christiana, notice requirements were triggered under TILA with each transfer but were not satisfied by defendants.

In particular, the Howes alleged that when US Bank acquired an interest in the Note, purportedly on November 21, 2009 (Apx. 47, Complaint ¶ 109), neither US Bank nor its servicer, Wells Fargo, notified the Howes of their new creditor, as required by 15 U.S.C. § 1641(g).  According to the Howes, Wells Fargo and US Bank also failed to disclose their position on partial payments, as required by 15 U.S.C. § 1639c(h).  Similarly, they claimed that when the Note was allegedly removed from the Trust on January 1, 2012, and when the Note was purportedly transferred to Christiana, notice of a new creditor and information on the creditor's stance on partial payments, were not sent to the Howes. Apx. 47, Complaint ¶¶ 112,

---

[51] Wells Fargo and US Bank point out that plaintiffs erroneously refer to TILA as part of Title 11 of the United States Code.  They assert, Apx. 91-92, MTD Memo at 15 -16 n.12:

> Of course, TILA is part of Title 15, and the correct citations are 15 U.S.C. §§ 1639c(h) and 1641(g), not 11 U.S.C. §§ 1639c(h) and 1641(g). The irony is not lost that, in a Complaint filled with allegations of fraud based on obvious mistakes, Mr. and Mrs. Howes have misspoken in their pleading. Notwithstanding these errors, Wells Fargo and U.S. Bank do not ascribe to them an intent to mislead the Court or to misrepresent the law to Defendants.

118.  For these alleged TILA violations, the Howes sought statutory damages in the amount of $4,000.

Congress enacted TILA, 15 U.S.C. §§ 1601 *et seq.*, to "'assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit.'"  *Mourning v. Family Publications Serv., Inc.*, 411 U.S. 356, 364–65 (1973) (quoting 15 U.S.C. § 1601(a)). The statute "requires creditors to provide borrowers with clear and accurate disclosures of terms," *Beach v. Ocwen Federal Bank*, 523 U.S. 410, 412 (1998), and imposes civil liability on creditors who fail to do so.  *Koons Buick Pontiac GMC, Inc. v. Nigh,* 543 U.S. 50, 54, (2004); 15 U.S.C. § 1640(a).

The notice requirements are set forth in 15 U.S.C. §§ 1639c(h) and 1641(g).  In pertinent part, § 1641(g) provides:

> **(g) Notice of new creditor.**
>   **(1) In general.**
>   In addition to other disclosures required by this subchapter, not later than 30 days after the date on which a mortgage loan is sold or otherwise transferred or assigned to a third party, the creditor that is the new owner or assignee of the debt shall notify the borrower in writing of such transfer, including —
>     (A) the identity, address, telephone number of the new creditor;
>     (B) the date of transfer;
>     (C) how to reach an agent or party having authority to act on behalf of the new creditor;
>     (D) the location of the place where transfer of ownership of the debt is recorded; and
>     (E) any other relevant information regarding the new creditor.

Section 1639c(h) states:

> **(h) Policy regarding acceptance of partial payment**
>
> In the case of any residential mortgage loan, a creditor shall disclose prior to settlement or, in the case of a person becoming a creditor with respect to an existing residential mortgage loan, at the time such person becomes a creditor-
>     (1) the creditor's policy regarding the acceptance of partial payments; and
>     (2) if partial payments are accepted, how such payments will be applied to

such mortgage and if such payments will be placed in escrow.

Wells Fargo and US Bank argue that the TILA claims against them are barred by limitations, as set forth in 15 U.S.C. § 1640(e). It states: "[A]ny action under this section may be brought . . . within one year from the date of the occurrence of the violation." Wells Fargo and US Bank contend: "Mr. and Mrs. Howes' cause of action accrued . . . on December 31, 2011. The instant Complaint was not filed until September 3, 2013, well past the statutory deadline for notices triggered by assignments . . . . As such, the TILA claims under Count V are time-barred, and must be dismissed." Apx. 93, Wells Fargo MTD at 17.

Here, if the TILA violation allegedly committed by US Bank and Wells Fargo occurred in January 2012, when the Trust was terminated and the Howes were not notified of a new creditor, then the Howes had to file suit by January 2013, in order to satisfy 15 U.S.C. § 1640(e). Because suit was not filed until September 3, 2013, the TILA claims as to Wells Fargo and US Bank are barred by limitations.

In the alternative, plaintiffs argue that, even if Count V as to Wells Fargo and US Bank is time-barred, they nevertheless may assert their TILA claim as a "recoupment" defense to the Amended Claim, warranting a reduction of the Note balance for each violation. Apx. 49, Complaint ¶ 121.B. Plaintiffs insist recoupment as a defense in not subject to the statute of limitations. Apx. 151-52, Howes Opposition to Wells Fargo MTD.

As plaintiffs suggest, the doctrine of recoupment permits circumvention of the statute of limitations to the extent a claim is pleaded defensively. Indeed, on the subject of recoupment, the Supreme Court has stated: "Such a defense is never barred by the statute of limitations so long as the main action itself is timely." *Bull v. United States*, 295 U.S. 247, 262 (1935). With respect to TILA in particular, the statute provides guidance. Section 1640(e) provides, in part:

> This subsection [establishing the one-year statute of limitations] does not bar a person from asserting a violation of this subchapter in an action to collect the debt which was brought more than one year from the date of the occurrence of the violation as a matter of defense by recoupment or set-off in such action, except as otherwise provided by State law.

Notably, at the hearing on January 6, 2014, counsel for Wells Fargo insisted that plaintiffs "don't [have] an affirmative claim" for TILA violations. Apx. 338. But, counsel conceded: "There may be a recoupment available as a defense." Apx. 337.

The Fifth Circuit decision in *In Re: Coxson*, 43 F.3d 189 (5th Cir. 1995), cited by plaintiffs, is informative. There, debtors filed an adversary proceeding complaint and claimed that certain loan documents violated TILA. The *Coxson* Court concluded that the TILA violations were defensive because they were in response to the defendants' proof of claim. *Id.* at 194 (citing *In re Jones,* 122 B.R. 246, 249 (W.D. Pa. 1990)); *see also Allen v. Bank of Am., N.A.*, No. EP-14-CV-429-KC, 2015 WL 1726986, at *14 (W.D. Tex. Apr. 15, 2015) ("[T]he mere fact that the party raising the recoupment claim is the plaintiff in a TILA case does not necessarily preclude a finding that the claim is raised defensively."); *In re McClendon*, 488 B.R. 876, 887 (Bankr. E.D.N.C. 2013) ("Although procedurally offensive on its face, an adversary proceeding can serve as the proper context for recoupment when the primary objective is to defeat the basis of the original proof of claim.").

In *In re Salazar*, Adv. Pro. No. 10-00101, 2011 WL 1237648, at *6 (Bankr. D. Md. Mar. 30, 2011), Judge Catliota explained:

> [T]he Court routinely consolidates separate objections to claims with related adversary proceedings that involve interrelated issues concerning the same transaction. To deny Plaintiffs the defense of recoupment here [because it was included in an adversary proceeding complaint] would be to elevate form over substance.

Plaintiffs' decision to lodge the TILA violation via an adversary proceeding does not

preclude plaintiffs from using the TILA violation as a defense to the claims of the defendants. Plaintiffs' TILA violations may serve as a basis for a recoupment defense or a set-off in regard to the claim objection. Moreover, given that the plain language of 15 U.S.C. § 1640(e) provides that the one-year statute of limitations does not bar a recoupment defense, plaintiffs are not foreclosed from relying on their TILA allegations to support a recoupment defense.

It does not appear from the record or the Bankruptcy Court's Memorandum Opinion of November 5, 2014, that the Bankruptcy Court intended to foreclose the Howes from lodging a recoupment defense based on the alleged violations of TILA. Indeed, in both the MTD Order and the Reconsideration Order, the Bankruptcy Court granted plaintiffs an opportunity to file an amended objection to the Amended Claim. Plaintiffs chose not to do so. Although plaintiffs did not comport with the deadlines set by the Bankruptcy Court, the Bankruptcy Court may, under 15 U.S.C. § 1640(e), grant leave to the Howes to file a belated amended claim objection setting forth a TILA recoupment defense.

## G.  Count VI -- Fair Debt Collection Practices Act

In Count VI, plaintiffs alleged violations of the FDCPA against Wells Fargo, US Bank, and Christiana. They characterize various representations made by US Bank and Wells Fargo in the foreclosure cases and in the bankruptcy case as "false, deceptive, or misleading." Apx. 51, Complaint ¶ 135.

Congress enacted the FDCPA in 1977, *see* Pub. L. 95–109, 91 Stat. 874 (1977), to protect consumers from debt collectors who engage in "abusive debt collection practices . . . , to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e); *see Jerman v. Carlisle, McNellie, Rini, Kramer &*

*Ulrich LPA*, 559 U.S. 573, 576 (2010) (same); *United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 135 (4th Cir. 1996). The statute is concerned with "rights for consumers whose debts are placed in the hands of the professional debt collectors . . . ." *DeSantis v. Computer Credit, Inc.*, 269 F.3d 159, 161 (2d Cir. 2001); *see also Ruth v. Triumph Partnerships*, 577 F.3d 790, 797 (7th Cir. 2009). "A significant purpose of the Act" is the elimination of "abusive practices by debt collectors . . . ." *Brown v. Card Service Center*, 464 F.3d 450, 453 (3d Cir. 2006). Because the FDCPA is a remedial statute, *id.*, it is construed liberally in favor of the debtor. *See, e.g., Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 393 (4th Cir. 2014) (citing *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 561–62 (1987) (recognizing that remedial statutes are to be construed liberally)); *Glover v. F.D.I.C.*, 698 F.3d 139, 149 (3d Cir. 2012); *Hamilton v. United Healthcare of La.*, 310 F.3d 385, 392 (5th Cir. 2002).

Section 1692e(5) of 15 U.S.C. provides: "A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section: . . .(5) The threat to take any action that cannot legally be taken or that is not intended to be taken." Section 1692f of the same Title states, *inter alia*: "A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt."

To establish a claim under the FDCPA, "a plaintiff must prove that: '(1) the plaintiff has been the object of collection activity arising from consumer debt; (2) the defendant is a debt collector as defined by the FDCPA; and (3) the defendant has engaged in an act or omission prohibited by the FDCPA.'" *Boosahda v. Providence Dane LLC*, 462 F. App'x 331, 333 n.3 (4th Cir. 2012) (quoting *Ruggia v. Wash. Mut.*, 719 F. Supp. 2d 642, 647 (E.D. Va. 2010)); *see Stewart v. Bierman*, 859 F. Supp. 2d 754 (D. Md. 2012), *aff'd sub nom. Lembach v. Bierman*,

528 F. App'x 297 (4th Cir. 2013).  "Debt collectors that violate the FDCPA are liable to the

debtor for actual damages, costs, and reasonable attorney's fees.  15 U.S.C. § 1692k(a)(1),

(a)(3)."  *Russell*, 763 F.3d at 389.  "The FDCPA also provides the potential for statutory

damages up to $1,000 subject to the district court's discretion.  *Id.* § 1692k(a)(2)(A)."  *Id.*

In particular, the Howes contend that "US Bank caused at least three false affidavits to be

filed in the First Foreclosure Case, including the Kennerty Affidavits . . . ."  Apx. 50-51,

Complaint ¶ 130.  As noted, it is unclear from the record as to the precise date that the Kennerty

Affidavits were submitted in the First Foreclosure Case, but it was sometime before January 3,

2011, when the case was voluntarily dismissed.  Apx. 31, Complaint ¶ 36.  The Howes also

contend that, when initiating the Second Foreclosure Case on February 21, 2012, US Bank and

Wells Fargo falsely claimed ownership of the Note, in violation of the FDCPA.  Apx. 51,

Complaint ¶ 131.  They also insist that during the Second Foreclosure Case, US Bank and Wells

Fargo filed at least four false affidavits in an effort to establish their interest in the Note.  Apx.

51, Complaint ¶ 132.

With respect to the bankruptcy case, the Howes allege that both US Bank and Wells

Fargo asserted falsely that the Debtor was liable to it for $740,334.24.  In addition, the Howes

contend that the Plan Objection submitted by Wells Fargo on January 9, 2013, on behalf of US

Bank, "falsely claimed" that US Bank was the holder of the Note.  Apx. 50, Complaint ¶ 127.

Collectively, according to the Howes, this conduct amounts to "falsely representing the

character, amount, or legal status of a debt, as prohibited by 15 U.S.C. § 1692e(2)(A), and using

false representation or deceptive means to collect or attempt to collect a debt from the consumer,

as prohibited by 15 U.S.C. § 1692e(10)."  Apx. 51, Complaint ¶ 135.  The Howes sought

statutory damages in the amount of $1,000.00 for each purported FDCPA violation, and a

reduction in the balance of the Note by way of recoupment.  Apx. 52, Complaint ¶ 52.

In response, Wells Fargo and US Bank argue that the FDCPA claim is barred by limitations.  Apx. 93, Wells Fargo MTD at 17.  Under 15 U.S.C. § 1629K(d), "[a]n action to enforce any liability created by [the FDCPA] may be brought in an appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction, within one year from the date on which the violation occurs."  It appears that the statute of limitations bars some, but not all, of the alleged FDCPA violations here.  In particular, misrepresentations in the foreclosure cases are time barred, but purported misrepresentations in the bankruptcy case are not.

The First Foreclosure Case was voluntarily dismissed on January 3, 2011.  Therefore, the time to challenge any representations made in the case as violative of the FDCPA expired long before the adversary Complaint was filed on September 3, 2013.  The initiation of the Second Foreclosure Case occurred on February 21, 2012.  Again, the adversary Complaint here was not filed until September 3, 2013.  Thus, allegations challenging statements made in the foreclosure cases were properly dismissed under the FDCPA.

Nevertheless, even if these FDCPA claims are time-barred, they may serve as a basis for a recoupment defense.  For the same reasons set forth in the discussion concerning plaintiffs' TILA claims, *supra*, the alleged FDCPA violations committed during the foreclosure cases may establish a valid recoupment defense, not barred by limitations.  Accordingly, the Bankruptcy Court may grant the Howes leave to file an amended claim objection to lodge such a defense.

Turning to the purported misrepresentations by US Bank and Wells Fargo made in the bankruptcy case, plaintiffs challenge the Plan Objection filed on January 9, 2013, the initial Claim filed on March 8, 2013, and the Amended Claim filed on March 15, 2013.  With respect to

these statements, the statute of limitations had not yet expired when the Complaint was filed on September 3, 2013.

Although the allegations of FDCPA violations appear timely, the court properly dismissed these FDCPA claims.  Again, the theory of liability hinged on the effect of the termination of the Trust.  In the Plan Objection, the Howes claimed that Wells Fargo, on behalf of US Bank "as trustee for the Trust . . . . falsely claimed that US Bank is the holder of the Note . . . ."  Apx 50, Complaint ¶ 127.  For the reasons already discussed, this theory of liability is flawed.  Therefore, dismissal of the FDCPA claim was warranted.

I turn to the FDCPA claims against Christiana, which are also not barred by the statutory one-year limitations period. As indicated, Christiana did not obtain an interest in the Note until after commencement of the Chapter 13 case.  Plaintiffs insist that Christiana "violated the FDCPA by using false, deceptive, or misleading representations or means in connection with the collection of a debt, as prohibited by 15 U.S.C. § 1692e, including but not limited to falsely representing the character, amount, or legal status of a debt, as prohibited by 15 U.S.C. § 1692e(2)(A), and used false representation or deceptive means to collect or attempt to collect a debt from the consumer, as prohibited by 15 U.S.C. § 1692e(10)."  Apx. 51, Complaint ¶ 135. However, the Complaint does not identify a particular offending document or affidavit submitted by Christiana in the bankruptcy case that is fraudulent or deceptive.  Rather, the theory of liability against Christiana appears to be that because the Trust was terminated, the transfer of the Amended Claim to Christiana was invalid.  In plaintiffs' view, any effort on the part of Christiana to prosecute the Amended Claim and collect on the Note in the bankruptcy case contravenes the FDCPA.

In response, Christiana contends its conduct did not come within the ambit of the FDCPA

because it is not a debt collector.  It explains, Apx. 169, Carrington MTD at 5:

> The Complaint alleges that WSFS Bank is a debt collector as defined by 15 U.S.C. § 1692a(6) which reads: "The term "debt collector" means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts." However, the statute continues to define the term debt collector by clarifying that, "The term does not include— (A) any officer or employee of a creditor while, in the name of the creditor, collecting debts for such creditor." *Id.* As such mortgage lenders and servicers have been expressly excluded from FDCPA claims.

Christiana's argument is flawed. It maintains that the Howes cannot state a claim against Christiana under the FDCPA because "loan servicers" and "lenders" are not "debt collectors." But, the exemption for loan servicers and lenders "does not apply where a loan servicer acquires a loan after it has already gone into default." *Zervos v. Ocwen Loan Servicing, LLC*, JKB-11-CV-03757, 2012 WL 1107689, at *3 (D. Md. Mar. 29, 2012).  Indeed, contrary to the assertions of Christiana, there is no absolute rule or express exclusion in the FDCPA that precludes mortgage lenders and servicers from being debt collectors.  The inquiry is much more fact-bound and requires an examination of the entity collecting or attempting to collect the debt and the status of the debt when such efforts commenced.

In particular, the FDCPA defines the term "debt collector," in relevant part, as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."  15 U.S.C. § 1692a(6).  Therefore, to be subject to the FDCPA, the entity must be "a business the principal purpose of which is the collection of any debts," or one that "regularly collects or attempts to collect . . . debts . . . ."  15 U.S.C. § 1692a(6); *see Schlegel v. Wells Fargo Bank, N.A.*, 720 F.3d 1204, 1208-09 (9th Cir. 2013); *Police v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 404 (3d Cir. 2000).

Further, the Act specifies that the definition of "debt collector" "does not include" an entity that is "collecting or attempting to collect any debt . . . . to the extent such activity . . . (iii) concerns a debt which was not in default at the time it was obtained by such person . . . ." § 1692(a)(6)(F)(iii).   Generally speaking, entities servicing or collecting a debt they were assigned before default are considered "*creditors*" under the Act.  A "creditor" is defined as "any person who offers or extends credit creating a debt or to whom a debt is owed, but such term does not include any person to the extent that he receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt for another."  15 U.S.C. § 1692a(4).

"The structure of the Act suggests that" an entity receiving or attempting to collect money due on a debt "must be one or the other," that is, either a debt collector or a creditor. *Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 539 (7th Cir. 2003); *see F.T.C. Check Investors, Inc.*, 502 F.3d 159, 173 (3d Cir. 2007) ("[A]s to a specific debt, one cannot be both a 'creditor' and a 'debt collector,' as defined in the FDCPA, because those terms are mutually exclusive."); *accord Bradford v. HSBC Mortgage Corp.*, 829 F. Supp. 2d 340, 348 (E.D. Va. 2011).  In other words, creditors and debtors are generally "mutually exclusive" categories under the FDCPA.  *Schlosser*, 323 F.3d at 536.

Provided the entity meets the basic criteria to be either a "debt collector" or a "creditor" under the FDCPA, the status of the entity (*i.e.*, debt collector versus creditor) in any given case is determined with respect to the particular debt at issue, and depends on the purpose for which the entity is assigned the debt.  *See* 15 U.S.C. § 1692a(4) (excluding from definition of "creditor" a person who "receives an assignment or transfer of *a debt* in default *solely for the purpose of facilitating collection* of such debt for another") (emphasis added); *id.* § 1692(a)(6)(F)(iii)

(excluding from definition of "debt collector" a person who is collecting "any debt . . . to the extent such activity . . . (iii) concerns *a debt* which was not in default at the time it was obtained . . . .") (Emphasis added). "If the one who acquired the debt continues to service it, it is acting much like the original creditor that created the debt." *Schlosser*, 323 F.3d at 536. "On the other hand, if [the entity] simply acquires the debt for collection, it is acting more like a debt collector." *Id.*[52]

"To distinguish between these two possibilities, the Act uses the status of the debt at the time of the assignment . . . ." *Schlosser*, 323 F.3d at 536; *see also* 15 U.S.C. § 1692a(4); *id.* § 1692(a)(6)(F)(iii). The Sixth Circuit has summarized the basic analysis as follows, *Bridge v. Ocwen Federal Bank, FSB*, 681 F.3d 355, 359 (6th Cir. 2012):

> For an entity that did not originate the debt in question but acquired it and attempts to collect on it, that entity is either a creditor or a debt collector depending on the default status of the debt at the time it was acquired.[ ] The same is true of a loan servicer, which can either stand in the shoes of a creditor or become a debt collector, depending on whether the debt was assigned for servicing before the default or alleged default occurred.

*Accord Yarney v. Ocwen Loan Servicing, LLC*, 929 F. Supp. 2d 569, 575 (W.D. Va. 2013).[53]

Christiana, the party seeking to collect on the debt, did not originate the debt but instead acquired it through a transfer on or about June 11, 2013.  Under these circumstances, the analysis

---

[52] Of course, an entity that does not also meet the general criteria defining "debt collector" in 15 U.S.C. § 1692a(6) would not be subject to the FDCPA even if it were assigned a debt already in default.

[53] Although the legal status of the debt itself is significant, it is not always dispositive. Under certain circumstances, in order to prevent absurd results, courts have looked to the entity's behavior with regard to the debt upon assignment.  For example, an entity that mistakenly believes a debt was in default when the entity acquired the debt, and treats it as such, is not freed from the strictures of the Act by its own error.  *Schlosser*, 323 F.3d at 358; *see also Bridge*, 681 F.3d at 362-63; *Gritters v. Ocwen Loan Servicing, LLC*, 14-C-00916, 2014 WL 74151682, at *4 (N.D. Ill. Dec. 31, 2014); *Belin v. Litton Loan Servicing, LP*, 8:06-cv-760-T-24 EAJ, 2006 WL 1992410, at *3 (M.D. Fla. July 14, 2006).

generally turns on whether the debt was in default at the time it was acquired.  When the Note was purportedly assigned to Christiana, the debt had long been in default.  Indeed, Mr. Howes had already sought Chapter 13 protection.  Given the default on the debt, Christiana would qualify as a debt collector under the FDCPA.  But, that does not end the analysis.

Although distinguishable, *Stewart v. Bierman*, *supra*, 859 F. Supp. 2d 754, is instructive. There, plaintiffs asserted that defendants violated the FDCPA and the Maryland Consumer Protection Act, C.L. §§ 13-201 *et seq.*, because law firm employees fabricated signatures on the order to docket foreclosure and other documents. In concluding that the signatures contained on the foreclosure documents were not material for the purposes of the FDCPA, Judge Titus stated, 859 F. Supp. 2d at 764:

> While the Court agrees that the Defendants' foreclosure practices were shortcuts that do not comply with the signature and acknowledgement requirements of the Maryland rules, the facts alleged by Plaintiffs do not rise to the level of materiality on which a FDCPA claim can be maintained. Although the trustee signatures are alleged not to be those of the Defendants, they are not actionable because they were not material. *See Warren* [*v. Sessoms & Rogers, P.A.*, 676 F.3d 365, 374-75 (4th Cir. 2012)]. The Orders to Docket were correct in every way except that the signatures were affixed with the authority of the purported signer, but not in fact signed by the person whose name was affixed. *See Harvey v. Great Seneca Fin. Corp.,* 453 F.3d 324, 332 (6th Cir. 2006) (rejecting plaintiff's argument that defendant's conduct violated Section 1692e because plaintiff "never denied in her complaint that she owed [defendant] a debt, nor did she claim that [defendants] misstated or misrepresented the amount that she owed"); *Johnson,* 2011 WL 4550142, at *10 ("To the extent Plaintiffs' allegations imply the filing of a lawsuit without substantiating documentation is false, deceptive or misleading, Plaintiffs do not state a claim [because] insufficient evidence or documentation claims based on the filing of a state court complaint do not constitute viable claims under section 1692e.") (quotation omitted).

Judge Titus relied on the same reasoning to dismiss plaintiffs' MCPA claim.  Notably, he said: "The manner or procedure of affixing signatures to documents that are accurate in every other way except for the signature does not affect the accuracy of the underlying debt. . . . The actual process and method of affixing signatures to court documents is immaterial to a debtor

where the existence of the debt and a default are not disputed." *Id.* at 679.

In affirming the dismissal of the FDCPA and MCPA claims, the Fourth Circuit reasoned in *Lembach*, 528 F. App'x at 303 (internal citation omitted):

> Although we do not look favorably upon improper behavior by attorneys, we ultimately cannot find that the misrepresentations [the substitute trustee] made are material because they have no connection to the debt at issue in this case. The Lembachs were unquestionably in default, and the documents correctly stated the debt. The Lembachs fail to allege how they, or any consumer, would be misled by a signature by someone other than the trustee that is affixed to a document that was substantively correct. We recognize the fact that the trustee's signature was required under the Maryland rules to file a foreclosure action. However, the fact that Maryland has adopted foreclosure regulations that address the particularities of filing a foreclosure action has no bearing on whether a signature is material under federal law. Because the signatures have no connection to the debt, and the Lembachs fail to show how the fraudulent signatures would mislead even the least sophisticated consumer, their claim fails.

Despite Christiana's status under FDCPA as a debt collector, dismissal of the FDCPA claim as to Christiana was proper. As indicated, in the Complaint the Howes did not identify any particular statement or affidavit submitted by Christiana in the bankruptcy case as false or deceptive. This distinguishes the claims against Christiana from the claims against US Bank and Wells Fargo. As to US Bank and Wells Fargo, plaintiffs alleged that US Bank and Wells Fargo filed false affidavits in the First Foreclosure Case and in the Second Foreclosure Case. In contrast, the alleged deception committed by Christiana was merely an effort by Christiana to prosecute the Amended Claim in the bankruptcy case, despite termination of the Trust. Apx. 50, Complaint ¶ 126.

Once again, the theory of the liability rests on the faulty premise that because the Trust was terminated, no adversary defendant, including Christiana, could claim ownership of the Note. Plaintiffs suggest Christiana engaged in deceptive acts by not disclosing the termination of the Trust. For the reasons already discussed, however, this argument is unavailing. Therefore, dismissal of the FDCPA claim as to Christiana was proper, because any failure to disclose the

termination of the Trust was not material.

**H.      Count VII – Maryland Consumer Debt Collection Act; Count VIII -- Maryland Consumer Protection Act**

Count VII alleges that Wells Fargo, US Bank, and Christiana violated the MCDCA, Md. Code (2013 Repl. Vol., 2014 Supp.), C.L. § 14-201 *et seq.*  In Count VIII, plaintiffs allege that Wells Fargo and US Bank violated the MCPA, C.L. §§ 13-201 *et seq.*   Both counts pertain to defendants' efforts to enforce the Note in the foreclosure cases and the bankruptcy case.   In plaintiffs' view, US Bank, Wells Fargo, and Christiana allegedly sought to collect from the Howes amounts that they were not lawfully due, in violation of the MCDCA and MCPA. According to the Complaint, "as a proximate result of the Defendants' violations of the MCDCA [and MCPA], Plaintiffs have suffered damages, including emotional distress and mental anguish."   Apx. 53, Complaint ¶ 141; Apx. 53-54, Complaint ¶ 143.

On appeal, the Howes clarify the particular facts alleged in the Complaint that pertain to Counts VII and VIII.   ECF 18 at 15, Reply.   In particular, the Howes complain, *inter alia*, that the Amended Claim contains "bogus foreclosure and inspection fees, and fails to credit all of Debtor's payments."   Apx. 45, Complaint ¶ 96; *see also* Apx. 27-28, Complaint ¶ 22. They seek actual damages, attorneys' fees, and a reduction in the balance of the Note by way of recoupment, to the extent that plaintiffs' claims are otherwise barred by limitations.

The MCDCA prohibits certain enumerated actions by a debt collector in "collecting or attempting to collect" an "alleged debt arising out of a consumer transaction." C.L. §§ 14-201(b), 14-202; *see also* C.L. § 14-202(1)-(9) (enumerating prohibited actions). The statute authorizes a civil action against a collector "for any damages proximately caused by" a violation of the MCDCA, "including damages for emotional distress or mental anguish suffered with or without accompanying physical injury." C.L. § 14-203.

The MCPA prohibits certain "unfair or deceptive trade practices." C.L. § 13-301. It contains a private right of action allowing a plaintiff "to recover for injury or loss sustained by him as the result of a practice prohibited by" the MCPA. C.L. § 13-408(a).   One of the "unfair or deceptive trade practices" prohibited by the MCPA is a violation of the MCDCA. *See* C.L. § 13-301(14)(iii). Here, plaintiffs' MCPA claims as to Wells Fargo and US Bank are expressly predicated on the alleged violation of the MCDCA.   *See* Apx. 53, Complaint ¶ 143.   Thus, it seems that, as to Wells Fargo and U.S. Bank, Counts VII and VIII stand or fall together.

To bring an action under C.L. § 13-408, a plaintiff must allege "(1) an unfair or deceptive practice or misrepresentation that is (2) relied upon, and (3) causes [him] actual injury." *Bierman*, *supra*, 859 F. Supp. 2d at 768 (citing *Lloyd v. Gen Motors Corp*., *supra*, 397 Md. at 143, 916 A.2d at 257).   Of particular relevance here, the MCPA requires an "actual injury." *Id.*

In *Citaramanis v. Hallowell*, 328 Md. 142, 151, 613 A.2d 964, 968 (1992), the Maryland Court of Appeals emphasized that because the MCPA's private right of action is limited to recovery of "injury or loss sustained," C.L. § 13-408, a "plaintiff pursuing a private action under the MCPA [must] prove actual 'injury or loss sustained'" in order to prevail.   *Id.* at 151, 613 A.2d at 968 (citation omitted); *accord McDaniel v. Baranowski*, 419 Md. 560, 587–88, 19 A.3d 927, 943 (2011). Because the MCDCA's private right of action is similarly predicated on recovery of "damages proximately caused by" a violation of the statute, C.L. § 14-203, there is no basis to conclude that the Maryland courts would reach a different interpretation of the MCDCA. Thus, actual damages appear to be a necessary element under both statutes.

The decision of the Maryland Court of Appeals in *Lloyd v. Gen. Motors Corp.*, *supra*, 397 Md. 108, 916 A.2d 257, is instructive.   There, the court stated, *id.* at 143, 916 A.2d at 277:

> This Court has held . . . that a private party suing under the Consumer Protection Act must establish "actual injury or loss." *Citaramanis v. Hallowell,*

328 Md. 142, 153-54, 613 A.2d 964, 969 (1992); *Morris v. Osmose,* 340 Md. 519, 538 n. 10, 667 A.2d 624, 635 n. 10 (1995); *McGraw v. Loyola Ford, Inc.,* 124 Md. App. 560, 581, 723 A.2d 502, 512 (1999), *cert. denied,* 353 Md. 473, 727 A.2d 382 (1999). See Maryland Code, (1975, 2005 Replacement Vol.) § 13-408 of the Commercial Law Article ("any person may bring an action to recover for injury or loss sustained by him as the result of a practice prohibited by this title"). We have, in earlier cases, established that, in order to articulate a cognizable injury under the Consumer Protection Act, the injury must be objectively identifiable. In other words, the consumer must have suffered an identifiable loss, measured by the amount the consumer spent or lost as a result of his or her reliance on the sellers' misrepresentation. *Golt v. Phillips,* 308 Md. 1, 11-14, 517 A.2d 328, 333-335 (1986); *Citaramanis,* 328 Md. at 151-53, 613 A.2d at 968-70 (1992); *Morris v. Osmose,* 340 Md. at 538 n. 10, 667 A.2d at 635 n. 10 (1995); *McGraw v. Loyola Ford,* 124 Md.App. 560, 581, 723 A.2d 502, 512 (1999), *cert. denied*, 353 Md. 473, 727 A.2d 382 (1999).

Here, plaintiffs contend that, as a result of the purported misrepresentations, they "have suffered damages, including emotional distress and mental anguish." Apx 52, Complaint ¶ 141. Judge Gordon noted that plaintiffs did not allege reliance on the purported misrepresentations.

A close review of plaintiffs' complaint reveals that their MCDCA and MCPA claims are couched in conclusory language, but are devoid of any factual detail as to the actual loss sustained as a result of the purported misrepresentations.   They offer no facts to suggest that they paid any or all of the debt as a result of alleged misrepresentations.  They also do not suggest that they are in default because of representations made by the adversary defendants.  In the absence of any detrimental reliance on the basis of the purported misrepresentations, dismissal of the MCDCA and MCPA claims, without prejudice, was proper.

## I.        Count IX – Objection to Claim

Count IX is an "Objection to Claim," in which plaintiffs challenged the Amended Claim filed by US Bank and Wells Fargo in the bankruptcy case, but now owned by Christiana.    According to plaintiffs, U.S. Bank and Wells Fargo lacked standing to file the Amended Proof of Claim; failed to credit plaintiffs with all payments made; and sought fees and

other costs to which they are not entitled. Apx. 55, Complaint ¶ 146. [54] In view of the foregoing, plaintiffs asked the court to reject the Amended Proof of Claim or to reduce it by the amount of damages awarded under their Complaint.

Although "the existence of a claim is controlled by state law, the allowance or disallowance of a claim in bankruptcy is a matter of federal law" to be decided by the bankruptcy court in "an exercise of its equitable powers." *In re Johnson*, 960 F.2d 396, 404 (4th Cir. 1992). To guide this process, the Bankruptcy Code sets forth a burden-shifting framework to establish the amount and validity of a claim. Fed. R. Bankr. P. Rule 3001(f); *see In re Harford Sands Inc.*, 372 F.3d 637, 640 (4th Cir. 2004). The process commences with the filing of a proof of claim by a creditor. The proof of claim is the creditor's statement of the amount and character of the claim. Fed. R. Bankr. P. Rule 3001(a).

A proof of claim is considered *prima facie* evidence of the amount and validity of the claim. Fed. R. Bankr. P. Rule 3001(f); *see In re Reid*, No. 05-11977 NVA, 2007 WL 2898703, at *1 (Bankr. D. Md. Sept. 28, 2007), *aff'd sub nom. Reid v. Knarf Investments*, 353 F. App'x 786 (4th Cir. 2009); *In re Bird*, No. 03-52010-JS, 2007 WL 2684265, at *5 (Bankr. D. Md. Sept. 7, 2007); *In re Anderson*, 349 B.R. 448, 461 (E.D. Va. 2006. The burden then shifts to the debtor to object to the claim and to rebut the presumptive validity of the claim. *In re Bird*, 2007 WL 2684265, at *5; *In re Merry–Go–Round Enterprises*, 241 B.R. 124, 134 (D. Md. 1999).

The objection may be included in an adversary proceeding complaint, with other affirmative claims. Fed. R. Bankr. P. 3007(b); Fed. R. Bankr. P. 3007 advisory comm. nn. (2007)(stating that "[a] party in interest may [ ] include an objection to the allowance of a claim

---

[54] The allegations in Count IX parallel, in many respects, the allegations in Count II, requesting a "Determination of Scope, Extent and Validity of Lien."

in an adversary proceeding).   Nevertheless, the objecting party has the burden of "presenting sufficient evidence to overcome the prima facie effect of the filed proof of claim." *In re Dornier Aviation (N. Amierca) Inc.*, No. 02-8199-SSM, 2005 WL 4781236, at *11 (Bankr. E.D. Va. Feb. 8, 2005), *aff'd*, 453 F.3d 225 (4th Cir. 2006).   "[I]f a debtor meets its burden, the creditor has the ultimate burden of proving the amount and validity of the claim by a preponderance of the evidence." *Harford*, 372 F.3d at, 640.

In this case, the Bankruptcy Court dismissed the Objection to Claim, without prejudice. Although Judge Gordon's rationale for dismissing this Objection to Claim was not explicit, he patently rejected plaintiffs' threshold argument that the Trust's termination precluded any of the adversary defendants from prosecuting a claim in the Chapter 13 case in connection with the Note.   But, he acknowledged the "confusion" as to the basis for Christiana's claim of ownership to the Note, and that the Howes may be entitled to certain reductions in the claim based on recoupment.   Apx. 226, Hearing of March 4, 2014.   As noted, he directed Christiana to file evidence in support of its claim of entitlement to enforce the Note.   *Id.* at 229-230.   And, he said that plaintiffs were entitled to lodge a challenge to the claim, through an amended complaint or an amended claim objection.   *Id.*

The Bankruptcy Court did not err in permitting the purported holder of the Note to submit supporting documentation; the ruling was in keeping with the claims objection procedure set forth in Fed. R. Bankr. P. 3007(b).   Accordingly, no error occurred in dismissal of the Objection of Claim, without prejudice.

## J.   Motions for Reconsideration

Fed. R. Civ. P. 59 governs a motion to amend judgment and is applicable in bankruptcy court pursuant to Fed. R. Bankr. P. 9023.   A motion for relief from judgment under Fed. R. Civ.

P. 60 is committed to the discretion of the bankruptcy court, pursuant to Fed. R. Bankr. P. 9024. Because Judge Gordon's rulings were not erroneous or incorrect as a matter of law, he neither erred nor abused his discretion in denying the Howes' motions for reconsideration.

## II.    Conclusion

For the foregoing reasons, I affirm the Bankruptcy Court's MTD Order entered on May 12, 2014, dismissing Count I, with prejudice, and Counts II through IX, without prejudice. I also affirm the Bankruptcy Court's Reconsideration Order entered on July 22, 2014, denying the Howes' motions for reconsideration.    I also recognize that the Howes may have valid recoupment defenses warranting a reduction in the Amended Claim. As such, the Bankruptcy Court may grant the Howes leave to file an amended objection to claim.

In view of the foregoing, I shall lift the stay of plan confirmation, which was granted, pending the outcome of this appeal, by this Court's Order entered December 16, 2014. ECF 29.

A separate Order follows, consistent with this Memorandum Opinion.


Date:   September 30, 2015                                  /s/
                                                Ellen L. Hollander
                                                United States District Judge